## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
ANGEL MEDINA,                  )
                               )
          Plaintiff,           )
                               )
     v.                        )     Civ. Action No. 97-594 (EGS)
                               )
DISTRICT OF COLUMBIA,          )
                               )
          Defendant.           )
_____)
```

### OPINION

Plaintiff Angel Medina, currently a Captain in the District of Columbia Metropolitan Police Department ("MPD"), brought suit against the District of Columbia, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, the Fifth Amendment, and the D.C. Human Rights Act.  Captain Medina claims that the District of Columbia engaged in unlawful and discriminatory employment practices based on his race and national origin, retaliated against him, and deprived him of his right to due process.  Pending before the Court is plaintiff's motion for partial summary judgment on Count I of his Second Amended Complaint and defendant's renewed motion to dismiss or, in the alternative, for summary judgment.  After careful consideration of the motions, responses and replies thereto, applicable law, and the entire record, the Court **denies**

plaintiff's motion for partial summary judgment and **grants in part and denies in part** defendant's motion.

I.    **BACKGROUND**[1]

Plaintiff, who is of Hispanic origin, became a police officer in the District of Columbia Metropolitan Police Department ("MPD") in 1985.  In early 1991, plaintiff was reassigned as an Investigator and then promoted to Sergeant on June 16, 1991.

In September 1992, plaintiff, then a Sergeant in the MPD's Office of Internal Affairs ("OIA"), participated in the MPD's 1992 Promotional Examination Process.  Composed of two phases, plaintiff passed the first written phase, ranking 18th out of the 323 candidates who vied for the rank of Lieutenant.  Accordingly, he was able to proceed to the second phase of the examination process -- an assessment phase.[2]  After the second phase, however, plaintiff's ranking dropped to 65 on a list of 79 candidates.

---

[1] The facts in this section draw from defendant District of Columbia's statement of material facts and are undisputed, unless otherwise indicated.

[2] If no adjustments are made due to any adverse impact on a protected group, 75 candidates are allowed to proceed from the written phase to the assessment phase of the examination process.

In May 1993, plaintiff filed a complaint against the MPD with the Department of Human Rights ("DHR").[3]  In his complaint -- DHR Complaint No. 93-210-DC (CN) ("first DHR complaint")-- plaintiff alleged that the MPD had denied him the promotion from Sergeant to Lieutenant during the 1992 Promotional Examination Process on the basis of his race and national origin.  On October 21, 1994, the DHR issued a Letter of Determination finding probable cause.  Less than a month after the DHR's determination and order, plaintiff was promoted from Sergeant to the rank of Lieutenant based on his results on the 1994 promotional examination.

On September 19, 1995, the DHR determined that the MPD had discriminated against plaintiff on the basis of race and national origin and issued a Summary Determination and Order.  This order required the District of Columbia to award plaintiff differential back pay for the period between December 1, 1992 and November 4, 1994, including any overtime to which he was entitled, and to ensure that plaintiff was free from any future reprisals or retaliatory actions.  *See* Summary Determination and Order (Sept. 19, 1995), Ex. 3 to Pl.'s Mot. for Partial Summ. J.  In April 2002, the Director of the D.C. Office of Human Rights ("OHR" --

---

[3] The D.C. Department of Human Rights and Local Business Development was abolished on October 1, 1999 and replaced by the D.C. Office of Human Rights.  *See* D.C. Code §§ 2-1411.01, 2-1411.06.

successor to the Department of Human Rights) sent a letter to the MPD's General Counsel advising him that the September 19, 1995 Summary Determination and Order represented "the final District Government administrative decision with which your Department is obligated to comply."  Letter from Charles Holman to Terrence Ryan (Apr. 22, 2002), Ex. 5 to Pl.'s Mot. for Partial Summ. J.

Sometime in October 1994, before plaintiff's promotion took effect, plaintiff and Captain Stanley Wigenton had a discussion in which plaintiff indicated that he would like to remain in OIA after his promotion to Lieutenant.  Plaintiff was informed by Sonya Proctor, then Director of OIA, that the Chief of Police indicated that the MPD "had to send people out to the streets." Def.'s Statement of Material Facts ¶ 46.  Plaintiff was reassigned to street duty.

In February 1995, plaintiff filed DHR Complaint No. 95-151-DC (CN) against the MPD ("second DHR complaint"), alleging that his transfer from OIA to street duty was discriminatory based upon his race and national origin.  In January 1997, the DHR issued a finding of no probable cause with respect to the second DHR complaint.  In February 1997, plaintiff requested that the City Administrator reconsider the DHR finding, but the director of the DHR informed plaintiff that the rules for D.C. government complaints had been amended in August 1996 to eliminate appeals to the D.C. administrator.  The DHR director also informed

plaintiff that if he wished to request reconsideration, he should submit an application, indicating where the DHR misapplied the law or misstated the facts, or if there was new evidence for submission.  Plaintiff chose not to re-file a request for reconsideration.

In 1996, plaintiff had very brief conversations with senior officers in the Homicide Division and the Criminal Investigations Division regarding his desire to transfer to those divisions should positions become available.  Plaintiff was not transferred to either division.  In 1997, plaintiff attempted to meet with Commander Boggs of the Narcotics and Special Investigation Division without an appointment to discuss his interest in transferring to that division.  Commander Boggs asked plaintiff to call back and schedule an appointment with her, but he did not do so.  Plaintiff was not transferred to the Narcotics and Special Investigation Division.

In April 1997, plaintiff met with Inspector Lloyd Coward, then director of OIA, and Captain Patricia Alexander to express his interest in a transfer back to OIA.  A few days later, plaintiff emailed his resume to Captain Alexander.  In late 1997 or early 1998, Inspector Coward was replaced by Inspector Kim Dine.  In February 1998, a teletype was issued listing the individuals transferred to OIA.  Plaintiff was not on the list. When plaintiff asked why he had not been transferred to OIA, he

was told by Inspector Dine that Dine was not aware that plaintiff had ever expressed any interest in the transfer.  Captain Patricia Alexander, the individual to whom plaintiff initially expressed his interest, admitted that she had forgotten to inform Inspector Dine of plaintiff's interest in OIA.  Inspector Dine then offered plaintiff a position with the Audit and Compliance Division, but plaintiff did not respond to her offer.

In October 1998, plaintiff filed his third and last complaint with the DHR -- Complaint No. 99-011-DC (CN) ("third DHR complaint") -- alleging that he had not been chosen for a transfer to a position in OIA because of his race and national origin.  On November 1, 1999, the DHR issued a finding of probable cause.  After the Letter of Determination was issued, the matter was not settled nor referred to the Commission on Human Rights for a public hearing.  Second Am. Compl. ¶ 101.  On January 5, 2000, the EEOC issued a right-to-sue letter based on all three of plaintiff's DHR complaints.

Throughout 2000, plaintiff applied for several other transfers but was not selected.  In May 2000, he applied for Lieutenant positions with the Gang Task Force and with the Family Violence Child Protection Unit, but was not selected for either position.  In September 2000, plaintiff hand-delivered an application for the Lieutenant position with the Force

6

Investigation Team, but was told that the position had already
been filled by the time he applied.

Plaintiff successfully participated in the 2000 Promotional
Examination Process.  He was promoted from Lieutenant to Captain
as a result of that exam.

On November 2, 2001, plaintiff was indicted in the United
States District Court for the District of Columbia for false
statements, conspiracy, and aiding and abetting, all relating to
a real estate transaction initiated primarily by his wife.
Second Am. Compl. ¶ 141.  On December 29, 2001, plaintiff was
placed on suspension without pay for conduct unbecoming an
officer pending resolution of the criminal matter.  *Id*. ¶¶ 150-
51.  At plaintiff's criminal trial in May 2002, two of the
charges were dismissed by the court at the close of evidence and
the jury acquitted plaintiff on the remaining charge.  *Id*.
¶¶ 152-54.  The judgment of acquittal was filed on May 8, 2002.
*Id*. ¶ 154.  On May 15, 2002, plaintiff's representative urged
Chief Ramsey to restore plaintiff to full duty and full pay.  *Id*.
¶ 161.  Plaintiff continued to remain on leave without pay status
until September 13, 2002, when he was placed on non-contact duty.
*Id*. ¶ 158.

On October 29, 2002, plaintiff filed his Second Amended Complaint in this Court.[4]  In his Second Amended Complaint, plaintiff alleges ten counts total, including violations of the Due Process Clause of the United States Constitution, Title VII, 42 U.S.C. §§ 1981 and 1983, and the D.C. Human Rights Act. Specifically, plaintiff alleges the following: (1) denial of due process in failing to enforce DHR's September 19, 1995 Summary Determination and Order; (2) denial of due process in failing to hold a hearing on plaintiff's second DHR complaint before making a finding of no probable cause; (3) violation of Title VII and 42 U.S.C. § 1981 based on transfer from OIA to street duty after 1994 promotion; (4) violation of Title VII and 42 U.S.C. § 1981 based on denial of plaintiff's request to transfer back into OIA; (5) retaliation in violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act based on failure to transfer plaintiff back to OIA; (6) denial of due process in failing to enforce the November 1, 1999 Letter of Determination finding probable cause; (7) retaliation in violation of 42 U.S.C. § 1981 based on repeated denial of transfer requests; (8) denial of due process in failing to reinstate plaintiff within thirty days of his acquittal; (9) retaliation in violation of 42 U.S.C. § 1981 based on refusal to return plaintiff to full duty and full pay within

---

[4] Plaintiff filed his original complaint in this matter on March 26, 1997 and his First Amended Complaint on March 15, 2000.

thirty days of his acquittal; and (10) discrimination and retaliation in violation of 42 U.S.C. § 1981 based on alleged denials of plaintiff's requests to participate in the Take Home Cruiser Program and an alleged break in to plaintiff's office.

## II.   STANDARD OF REVIEW

Plaintiff has filed a partial motion for summary judgment on Count I of his Second Amended Complaint.  Defendant has filed a renewed motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A complaint must present "enough facts to state a claim to relief that is plausible on its face," and "above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007).  The Court will accept as true all factual allegations in the complaint, and give the plaintiff the benefit of all inferences that can be drawn from the facts alleged.  *See id.* at 1965; *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996).  If, on a 12(b)(6) motion, matters outside the pleadings are presented to and not excluded by the Court, then the motion to dismiss shall be

treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(b).

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 323.

In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

In this case, the parties have engaged in extensive discovery and have submitted numerous exhibits in support of their motions that have been considered by the Court as to Counts I-VII and X of the Complaint. Accordingly, the Court will treat

defendant's motion as a motion solely for summary judgment as to
those Counts.  As for Counts VIII and IX, defendant appears to
only be moving to dismiss these claims and not moving for summary
judgment given that defendant has not included the events
underlying these claims in its statement of material facts and
neither party cites to record evidence with respect to these
claims.  The parties have not submitted, and the Court has not
considered, matters outside the pleadings with respect to these
claims.  Accordingly, the Court will treat defendant's motion as
a motion to dismiss with respect to Counts VIII and IX of the
Second Amended Complaint.

## III. **ANALYSIS**

Plaintiff alleges due process violations, discrimination,
and retaliation.  Defendant has moved to dismiss or for summary
judgment on all claims.  Plaintiff has moved for partial summary
judgment on Count I.  As discussed below, the Court denies
plaintiff's motion for partial summary judgment on Count I and
grants defendant's motion as to Counts I, II, VI, VII, and VIII.
The Court also grants defendant's motion as to the portion of
Count X alleging retaliation based on the office break in.
However, the Court denies defendant's motion as to Counts III,
IV, V, IX, the portion of X alleging discrimination as to both
events, and the portion of X alleging retaliation based on the

denial of plaintiff's participation in the Take Home Cruiser Program.

###   A.    Due Process Claims

In Counts I, II, VI, and VIII of his Second Amended Complaint, plaintiff alleges violations of the Due Process Clause of the Fifth Amendment.  Count I involves a claim for denial of due process in failing to enforce DHR's September 19, 1995 Summary Determination and Order awarding plaintiff back pay and declaring that he should not be subject to retaliation or reprisals.  In Count II, plaintiff asserts that defendant denied him due process by failing to hold a hearing on his second DHR complaint before finding no probable cause.  Count VI involves an alleged denial of due process based on defendant's failure to enforce the November 1, 1999 Letter of Determination finding probable cause as to plaintiff's third DHR complaint.  In Count VIII, plaintiff alleges a denial of due process based on the MPD's failure to reinstate plaintiff within thirty days of his acquittal of criminal charges.  Other than as to Count I, plaintiff does not specify whether he is bringing substantive or procedural due process claims so the Court will analyze his claims under both.[5]

---

[5] In his Reply to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, plaintiff specifically indicates that he is asserting a substantive due process claim in Count I.  *See* Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. at 1-2.

The Fifth Amendment to the United States Constitution
prevents the deprivation of life, liberty, or property without
due process of law.  U.S. Const. amend. V.  Due process falls
into two categories:  substantive and procedural.  Individuals
are not entitled to either form of due process in cases alleging
deprivation of property, however, unless they have a
constitutionally protected property interest.  *Washington Legal
Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir.
1997).  Property interests are not created by the Constitution.
*Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  "Rather they
are created and their dimensions are defined by existing rules or
understandings that stem from an independent source such as state
law -- rules or understandings that secure certain benefits and
that support claims of entitlement to those benefits."  *Id.*  A
legitimate claim of entitlement to a benefit and a legal cause of
action both constitute a property interest.  *Id.*; *Logan v.
Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

In its motion, defendant does not challenge plaintiff's
claim that he has a property interest in the cause of action
arising from his first DHR complaint or DHR's September 19, 1995
Summary Determination and Order, the cause of action stemming
from his second DHR complaint, the cause of action arising from
plaintiff's third DHR complaint and the November 1, 1999 Letter
of Determination, or his alleged entitlement to reinstatement

13

within thirty days of his acquittal.   Moreover, in response to
plaintiff's motion for partial summary judgment, defendant
expressly concedes that plaintiff has a property interest in the
September 19, 1995 Summary Determination and Order.   The Court
finds that plaintiff has a property interest in having his
grievances heard and redressed.   *See Long v. Dist. of Columbia*, 3
F. Supp. 2d 1477, 1479 (D.D.C. 1998).   However, plaintiff's
claims still fail.

### 1.   Substantive Due Process

To succeed on a substantive due process claim, plaintiff
must prove "egregious government misconduct" in depriving him of
his property interest.   *George Wash. Univ. v. Dist. of Columbia*,
318 F.3d 203, 209 (D.C. Cir. 2003).   Substantive due process
"prevents governmental power from being used for purposes of
oppression, or abuse of government power that shocks the
conscience, or action that is legally irrational [in that] it is
not sufficiently keyed to any legitimate state interests."
*Washington Teachers' Union v. Bd. of Educ. of the Dist. of
Columbia*, 109 F.3d 774, 781 (D.C. Cir. 1997) (quoting *Comm. of
United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d
929, 943-44 (D.C. Cir. 1988) (internal quotation marks and
citations omitted)).   To succeed on his Section 1983 claims,[6]

---

[6] Although plaintiff just alleges violations of the Due
Process Clause of the Constitution in the various due process
counts in his Second Amended Complaint, it is clear from the

plaintiff must at least show that D.C. officials are "guilty of grave unfairness in the discharge of their legal responsibilities.  Only a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief" under Section 1983.  *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (citation omitted).  A "mere violation of law does not give rise to a due process claim." *AFGE, AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007).  Moreover, "[i]nadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress under [Section 1983]." *Silverman*, 845 F.2d at 1080.  Substantive due process is "an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).  Governmental actions that "might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action" are not within the purview of substantive due process.  *Id*.  "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."  *Id*.

---

language used in the counts and in the summary judgment briefing that plaintiff is raising his claims under 42 U.S.C. § 1983.

Section 1983 is not intended to be used as a means of transferring "every state agency action in the nation to the federal courts through the assertion that the agency has acted irrationally or failed to provide a reasoned basis for its acts, such that the Due Process Clause is offended." *Beary Landscaping, Inc. v. Ludwig*, No. 05 C 5697, 2007 U.S. Dist. LEXIS 23431, at *37-*38 (N.D. Ill. Mar. 28, 2007).  "Claims that are, in essence, state law claims, cannot be given constitutional 'window dressing' in order to circumvent this basic limitation on Section 1983 actions." *Id.* at * 26.  Treating violations of state law as a violation of the Constitution makes the federal government the enforcer of state law.  *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988).  State courts, not federal courts, are the appropriate bodies to enforce state rules.  *Id.*

None of plaintiff's claimed violations of due process present the type of egregious conduct that the substantive portion of the Due Process Clause was meant to guard against. Even though the Court finds the allegations when viewed in the light most favorable to the plaintiff to present what appears to be arbitrary government action, or inaction in this case, these allegations do not present arbitrariness in the constitutional sense.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" (citation

16

omitted)).  Plaintiff has not presented evidence as to any of his due process claims from which a reasonable fact finder could find that defendant's conduct, as inexcusable as it may be, rose to the level of a constitutional violation.  Plaintiff's claims involve the failure of D.C. agencies to follow D.C. law.  The appropriate forum to seek redress for these claims is the D.C. Superior Court or D.C. Court of Appeals, not federal court.

For the one claim that plaintiff specifically identifies as a substantive due process claim -- Count I -- plaintiff claims that the Court should follow the failure-to-obey-court-order cases involving interference with the liberty interests of prisoners.  The main case plaintiff relies on is *Walters v. Grossheim*, 990 F.2d 381 (8th Cir. 1993).  In *Walters*, the Eighth Circuit upheld a district court decision finding a violation of due process rights when state prison officials failed to follow a state court default judgment requiring them to place a prisoner in a less restrictive security status at a prison.  *Id*. at 384-85.  The Eighth Circuit held that the prisoner had a liberty interest in being in a less restrictive environment protected by the Due Process Clause of the Fourteenth Amendment even though his liberty interest was created by state law.  *Id*. at 385; *see also McGann v. Cunningham*, 315 F. Supp. 2d 150, 155 (D.N.H. 2004) (finding that state court order to credit prisoner for good time created a liberty interest and state prison officials' failure to

award good time resulted in due process violation for deprivation
of liberty because prisoner served six months longer in prison
that he otherwise would have had the state prison officials
followed the court order).

The Court finds these cases inapposite to the case at bar
for at least two reasons.  First, plaintiff provides no
authority, and the Court is aware of none, suggesting that cases
involving deprivation of a prisoner's liberty have ever been used
as a basis for finding a violation of substantive due process in
cases involving a deprivation of property.  Although there is an
established body of law suggesting that keeping a prisoner longer
than his prison term or keeping him in high security confinement
despite a court order to the contrary results in a substantive
due process violation, this does not naturally lead to the
conclusion that a failure to pay money owed based on a state
agency's determination and order results in a substantive due
process violation.  Second, all of the cases cited by plaintiff
involve a state court order that was ignored by state officials.
In this case, plaintiff has not gone to state court to seek
action against the D.C. government agencies that have allegedly
deprived him of property so he is only challenging the failure of
one D.C. government agency to act in accordance with another D.C.
agency's order.  Accordingly, the Court is not persuaded that the
prisoner liberty cases govern this case, and the Court therefore

denies plaintiff's motion for partial summary judgment and grants defendant's motion for summary judgment as to Count I.

### 2.   Procedural Due Process

Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  At a minimum, a procedural due process claim "requires the plaintiff to identify the process that is due." *Doe v. Dist. of Columbia*, 93 F.3d 861, 870 (D.C. Cir. 1996).  If procedures are already in place that provide adequate process but a plaintiff does not utilize those procedures, there is no constitutional violation.  *See Kremer v. Chem. Constr. Co.*, 456 U.S. 461, 485 (1982) (finding that a plaintiff's failure "to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy"); *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) ("[A] plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate. . . . If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.").

Plaintiff failed to utilize available state procedures before asserting his due process claims in federal court.[7]

### a.   Count II:  No Probable Cause Determination

With respect to Count II of his Second Amended Complaint, plaintiff alleges that defendant violated his due process rights when the D.C. Department of Human Rights concluded without a hearing that there was no probable cause to support plaintiff's second DHR complaint.  Plaintiff specifically challenges DHR's alleged practice of making credibility findings resulting in no probable cause determinations without providing individuals with a hearing where they can cross-examine witnesses.  Defendant moves for summary judgment on Count II, arguing that plaintiff could have availed himself to other avenues of state review before coming to federal court.

Under D.C. law, when an employment discrimination complaint is filed with OHR (formerly known as DHR), OHR must conduct an investigation and determine whether there is probable cause to

---

[7] As to Count I involving the failure of the MPD to obey the 1995 DHR Summary Determination and Order, plaintiff states that he is only asserting a substantive due process claim.  *See* Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Partial Summ. J. at 1 (asserting that Captain Medina's claim is a "substantive Due Process violation claim").  Even under a procedural due process analysis, however, this claim fails for the same reason that Count VI of plaintiff's Second Amended Complaint fails.  *See* discussion *infra*.  Plaintiff failed to utilize all the state procedures available to him in that he never pursued an action in state court, such as a writ of mandamus or District of Columbia Administrative Procedure Act claim, to compel the MPD to comply with the DHR order.

believe that there was an unlawful discriminatory practice.  D.C.
Code § 2-1403.05(a)-(b).  If OHR finds no probable cause, the
Director of OHR shall issue an order dismissing the allegations
of the complaint.  § 2.1403.05(c).[8]

In the Letter of Determination finding no probable cause as
to plaintiff's second DHR complaint, plaintiff was notified that,
pursuant to Section 114.4 of Title 4 of the D.C. Municipal
Regulations, he could file a request for reconsideration within
15 days of receipt of the letter informing him of the finding of
no probable cause.  Letter of Determination (Jan. 25, 1997), Ex.
BB to Def.'s Renewed Mot. to Dismiss, or in the Alternative, for
Summ. J. ("Def.'s Renewed Mot.").  Plaintiff was also informed
that failure to file a request for reconsideration would mean
that the Letter of Determination would become the final
administrative action of the District of Columbia government.
*Id*.  Finally, plaintiff was told that he could appeal the
decision to the City Administrator.

When plaintiff filed his appeal with the City Administrator,
however, he was informed by letter that the D.C. government
recently amended its rules and repealed the section providing for
appeals to the City Administrator.  *See* Letter from Gerald Draper

---

[8] The D.C. Code has been amended and renumbered since
plaintiff filed his second DHR complaint and received his no
probable cause determination.  At that time, D.C. Code
§ 2-1403.05 was D.C. Code § 1-2545.  The substance of subsections
(a)-(c) has not changed.

21

to Angel Medina (Mar. 3, 1997), Ex. DD to Def.'s Renewed Mot.  In
that letter, plaintiff was provided another opportunity to submit
a request for reconsideration to the Department of Human Rights,
explaining where DHR misapplied the law or misstated the facts or
presenting new evidence.  *Id*.  Plaintiff chose not to submit a
request for reconsideration.  Even without submitting the request
for reconsideration, plaintiff still could have brought an action
in D.C. Superior Court challenging the DHR Director's decision.
*See Long v. Dist. of Columbia*, 3 F. Supp. 2d 1477, 1479 (D.D.C.
1998); *Simpson v. Dist. of Columbia Office of Human Rights*, 597
A.2d 392, 397 (D.C. 1991).  Plaintiff chose not to do that
either.

The procedural scheme in place provides opportunities for
both administrative and judicial review of a no probable cause
determination.  *See Long*, 3 F. Supp. 2d at 1479 (finding D.C.
procedural scheme for reviewing a no probable cause finding to be
adequate).  Accordingly, due process has been met in this case.
*See Kremer*, 456 U.S. at 483 (finding that due process is met
where complainant has had a full opportunity to present claim and
administrative as well as judicial review is available to
challenge "no probable cause finding").  The fact that plaintiff
chose not to take advantage of the process available does not
create a due process claim.  *Id*. at 484.  Accordingly, the Court

grants defendant's motion for summary judgment as to Count II of the Second Amended Complaint.

### b.   Count VI: Failure to Enforce Letter of Determination

Plaintiff's alleged due process violation in Count VI of his Second Amended Complaint also does not survive summary judgment. In Count VI, plaintiff alleges a due process violation resulting from the failure of any D.C. official to take steps to enforce the November 1, 1999 Letter of Determination finding probable cause as to plaintiff's third DHR complaint.  Plaintiff does not challenge the adequacy of the procedure.  Rather, he challenges the failure of officials to carry out the procedure on the books.

The D.C. Human Rights Act provides that in case of failure of conciliation efforts and after a finding of probable cause, the Office of Human Rights "shall cause to be issued and served in the name of the Commission, a written notice, together with a copy of the complaint, as the same may have been amended, requiring the respondent to answer the charges of such complaint at a public hearing . . . such hearing to be scheduled not less than 10 days or not more than 30 days after such service . . . ." D.C. Code § 2-1403.10.  Plaintiff alleges that the OHR (formerly DHR) violated his due process rights by failing to refer his third DHR complaint to the Commission on Human Rights for a hearing after a determination of probable cause was issued and the MPD failed to enter into conciliation.

23

The D.C. Court of Appeals has recognized two different bases for review of such agency inaction.  First, plaintiff had the ability to seek a writ of mandamus from the D.C. Court of Appeals.  *See Dillard v. Yeldell*, 334 A.2d 578, 579 (D.C. 1975) (recognizing "the availability of a writ in the nature of mandamus to compel a public officer to follow regulations governing the administrative agency"); see *also Yeager v. Greene*, 502 A.2d 980, 981 n.3 (D.C. 1985) (noting that the purpose of the writ of mandamus is to "require an official to perform an affirmative, mandatory action").  Rule 21 of the Rules of the District of Columbia Court of Appeals provides a procedure for seeking a writ of mandamus against a District of Columbia official.  Second, plaintiff could have sought review in the District of Columbia Court of Appeals based on the District of Columbia Administrative Procedure Act ("DCAPA").  *See* D.C. Code § 2-510 (formerly § 1-1510); *see also* D.C. Code § 11-722 (granting jurisdiction to review orders and decisions of any District agency in accordance with the DCAPA).  Under the DCAPA, the Court of Appeals can "compel agency action unlawfully withheld or unreasonably delayed."  D.C. Code § 2-510(a)(2); *Dillard*, 334 A.2d at 579.  Plaintiff chose not to pursue either of these avenues of relief.

The Second Circuit addressed a similar situation in *New York State Nat'l Org. for Women v. Pataki*, 261 F.3d 156 (2d Cir.

2001).  In *Pataki*, class members claimed that they were denied constitutionally adequate process because of the long delay they faced while prosecuting their discrimination claims before the New York State Division of Human Rights.  *Id*. at 161.  Thirty-four percent of cases before the Division took longer than three years between the opening and closing of the case.  *Id*.  The class members alleged that this delay prejudiced their ability to succeed on their discrimination claims.  *Id*. at 162.

In response to the claimed due process violation as a result of delay, the Second Circuit in *Pataki* ruled against the class members.  The Second Circuit held that the "availability of Article 78 procedures" meant that New York afforded the class members all of the process they were due under the Constitution. *Id*. at 168.  Article 78 empowers New York state courts to issue "common law writs of certiorari to review, mandamus, and prohibition."  *Id*. (citation omitted).  The Second Circuit found that recognizing the states' responsibility to prevent delays by the administrative agency "is more consistent with the 'spirit' of federalism than is unnecessarily subjecting state agencies to intrusive federal court intervention under the guise of § 1983." *Id*. at 169; *see also Idaho v. Coeur d' Alene Tribe*, 521 U.S. 261, 276 (1997) (Kennedy, J., joined by Rehnquist, C.J.) ("It is a principal concern of the court system in any State to define and maintain a proper balance between the State's courts on one hand,

and its officials and administrative agencies on the other."); *id.* ("Where, as here, the parties invoke federal principles to challenge state administrative action, the courts of the State have a strong interest in integrating those sources of law within their own system for the proper judicial control of state officials.").

This Court agrees with the reasoning of the Second Circuit. Plaintiff still had avenues of relief open to him in the D.C. Court of Appeals through a writ of mandamus or DCAPA proceeding. These procedures afforded plaintiff all the process he was due under the Due Process Clause of the Fifth Amendment of the Constitution.  Plaintiff's choice not to pursue these matters in a D.C. court means plaintiff cannot support a claim for a violation of procedural due process.  *See Alvin*, 227 F.3d at 116 ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.").  Thus, the Court grants summary judgment to defendant as to Count VI of the Second Amended Complaint.

### c.    Count VIII: Failure to Reinstate Within 30 Days of Acquittal

Plaintiff's due process claim in Count VIII of his Second Amended Complaint also does not survive summary judgment.  In Count VIII, plaintiff alleges that his due process rights were violated when the MPD failed to reinstate him to full status or

26

notify him of any administrative charges against him within 30 days of his acquittal of criminal charges, as required by MPD General Order 1202.  Defendant has moved to dismiss based on plaintiff's failure to state a claim for a violation of due process.

A constitutional violation actionable under 42 U.S.C. § 1983 is "not complete unless and until the State fails to provide due process."  *Zinermon v. Burch*, 494 U.S. 113, 126 (1990).  In this case, process was still available to plaintiff.  The District of Columbia Municipal Regulations establish an Office of Employee Appeals.  *See* D.C. Mun. Regs. tit. 6 § 600.1.  The regulations provide that a District employee may bring a grievance before the Office of Employee Appeals to appeal a final agency decision affecting "[a]n adverse action for cause that results in removal, reduction in grade, or suspension for ten (10) days or more." § 604.2(b).  Moreover, a career service employee "may file a grievance with an agency or personnel authority . . . when he or she believes that an employment practice which was applied to him or her violates a requirement of law or these regulations." § 845.1.  Plaintiff does not allege that any of these available procedures were inadequate to protect his rights.  Accordingly, the Court grants defendant's motion for summary judgment as to Count VIII of the Second Amended Complaint.

## B.    Counts III and IV: Discrimination Claims Based on Transfers

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In a case where the plaintiff offers no direct evidence of discrimination, the Court applies the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The basic allocation of burdens and order of presentation of proof are as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citations and internal quotation marks omitted).

A plaintiff's burden of establishing a prima facie case is "not onerous."  *Id*. at 253.  A plaintiff makes out a prima facie case of disparate-treatment discrimination "by establishing that: '(1) she is a member of a protected class; (2) she

28

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

Plaintiff alleges discrimination based on race and/or ethnic origin in Counts III, IV, and X[9] of his Second Amended Complaint. Defendant argues that plaintiff's discrimination claims in Counts III and IV do not survive because plaintiff has failed to establish the adverse employment action element of a prima facie case as to these claims. The Court disagrees.

In Count III of his Second Amended Complaint, plaintiff alleges that after his promotion to lieutenant in 1994 he was forced to leave his assignment in OIA to go to street duty while an African American promotee in OIA was not required to go to street duty. In Count IV of his Second Amended Complaint, plaintiff alleges that defendant discriminated against plaintiff when the MPD failed to select plaintiff for a transfer to OIA and selected a less-qualified white male instead. Plaintiff has established a prima facie case of discrimination as to both claims.[10]

---

[9] The Court addresses the discrimination claims in Count X of the Second Amended Complaint in a separate section of this Opinion, *infra*.

[10] In Counts III and IV of the Second Amended Complaint, plaintiff alleges discrimination in violation of Title VII and 42 U.S.C. § 1981. Because the D.C. Circuit has indicated that the

Both parties agree that the OIA-related transfers at issue in this case were lateral transfers in the sense that plaintiff suffered no "dimunition in pay or benefits" as a result of either the transfer out of OIA or the failure to transfer him back into OIA.  *See Brown*, 199 F.3d at 457.  The parties disagree, however, about whether these lateral transfers constitute adverse employment actions.

The D.C. Circuit has recognized that some lateral transfers can constitute adverse employment actions.  *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007).  For example, the Circuit has previously recognized that transfers that diminish an employee's supervisory responsibilities or involve "significantly different responsibilities" are adverse employment actions.  *Id.* (citations and internal quotation marks omitted).  More generally, a lateral transfer constitutes an adverse employment action if there are "materially adverse consequences affecting the terms, conditions, or privileges of . . . employment or . . . future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm."  *Brown*, 199 F.3d at 457.  "Whether a particular reassignment is materially

same *McDonnell Douglas* burden shifting framework applies to claims under either statute, *see Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1412 n.7 (D.C. Cir. 1998), the Court does not distinguish between the two statutes in its analysis.

adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2417 (2006) (internal quotation marks and citations omitted). The determination of whether a transfer or reassignment constitutes an adverse employment action is generally left to the jury. *Czekalski*, 475 F.3d at 365. If a reasonable juror could find that the reassignment constitutes an adverse employment action, "the court may not take that question away from the jury." *Id*.

In this case, the Court finds that there is a genuine issue that should be resolved by a jury as to whether plaintiff's forced reassignment from OIA to street duty and the later refusal of the MPD to transfer plaintiff back into OIA constitute adverse employment actions. In his deposition and declaration, plaintiff has provided concrete examples of how working in internal affairs provides opportunities not available in other areas of the police department. For example, plaintiff asserts that OIA is a centralized operation that spans all police districts, whereas most other police operations limit themselves to particular police districts. Medina Decl. ¶¶ 3-4, Ex. 5 to Pl.'s Opp'n to Def.'s Renewed Mot. Plaintiff also asserts that OIA provided training in surveillance, financial

31

investigation, and voice stress analysis that was not available to police officials in other parts of the police department. *Id*. ¶ 5.  During his deposition, plaintiff explained that OIA investigations are of a higher quality because OIA officials can spend more time on investigations than officials in other divisions.  Medina Dep. at 189:4-12, Ex. D to Def.'s Renewed Mot.  Plaintiff also asserted in his deposition that OIA provides skills that are desirable to security firms after police officials retire from the police force.  *Id*. at 189:16-190:2.  Viewing these facts in the light most favorable to plaintiff, the Court cannot find as a matter of law that plaintiff's transfer out of OIA and the MPD's refusal to transfer plaintiff back into OIA did not constitute adverse employment actions.

In addition to the adverse employment action element of a prima facie case, the Court also finds and defendant does not challenge that plaintiff has satisfied the other two elements. As a Hispanic, plaintiff is clearly a member of a protected class.  Plaintiff has also offered sufficient evidence from which this Court can determine that the transfer of plaintiff out of OIA and the failure to transfer plaintiff back into OIA give rise to an inference of discrimination.  Plaintiff has offered evidence that non-Hispanic promotees were not transferred to street duty in 1994 although he was forced to

transfer.  He has also offered evidence that the individuals selected to transfer into OIA in 1998 when he sought the OIA position were not Hispanics.  *See George*, 407 F.3d at 412 (finding that one way a plaintiff can satisfy the third prong of a prima facie case is by showing that she was treated differently from similarly situated employees).  Also, there is no evidence that plaintiff was transferred out of OIA in 1994 as a result of the elimination of his position or his lack of qualifications to be a lieutenant in OIA or that his non-selection for the position in OIA in 1998 was a result of lack of qualifications or absence of a vacancy.  *See Czekalski*, 475 F.3d 366 (finding that plaintiff subject to reassignment met the third prong when there was no indication that her reassignment was "precipitated by the elimination of her job" and there was a genuine issue as to whether she was "performing at a satisfactory level" (citation omitted)); *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (noting that a plaintiff who is not selected for a position can satisfy the third prong of the prima facie test by showing that rejection of a job applicant is not attributable to "absolute or relative lack of qualifications or the absence of a vacancy in the job sought" (internal quotation marks and citations omitted)).  Accordingly, the Court denies defendant's motion for summary judgment as to Counts III and IV of the Second Amended Complaint.

33

C.     **Retaliation Claims in Counts V, VII, and IX**

In Counts V, VII, and IX of the Second Amended Complaint, plaintiff alleges retaliation.[11]  Rather than asserting his retaliation claims under Title VII, plaintiff alleges violations of 42 U.S.C. § 1981[12] and the D.C. Human Rights Act.

A plaintiff claiming retaliation must prove his case under the same *McDonnell Douglas* burden-shifting framework used for discrimination claims.  *See Broderick v. Donaldson*, 437 F.3d 1226, 1231 (D.C. Cir. 2006).[13]  However, the elements of the

---

[11] The retaliation claims asserted by plaintiff in Count X of his Second Amended Complaint are addressed in a separate section of this Opinion, *infra*.

[12] The D.C. Circuit has never squarely decided whether retaliation claims can be brought under 42 U.S.C. § 1981.  *See Carney v. Amer. Univ.*, 151 F.3d 1090, 1094-95 (D.C. Cir. 1998) (assuming without deciding that plaintiff could pursue retaliation claim under Section 1981).  However, this Court agrees with the decision in *Valles-Hall v. Center For Nonprofit Advancement*, Civ. Action No. 06-806, 2007 WL 779385, at *29 n.22 (D.D.C. Mar. 12, 2007), that the 1991 revisions to Section 1981 broadened the scope of the statute to encompass such claims.  *See* 42 U.S.C. § 1981(b) (defining the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"); *see also Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) (noting that "in the aftermath of the 1991 Act, a number of courts have concluded that certain retaliatory discharge claims are actionable under § 1981").

[13] Retaliation claims under 42 U.S.C. § 1981 and the D.C. Human Rights Act are evaluated in the same way as Title VII retaliation claims.  *See Carney*, 151 F.3d at 1094-95 (applying the *McDonnell Douglas* framework to retaliation claims brought under 1981); *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir.1999) ("In interpreting its Human Rights Act the District of Columbia also follows [the *McDonnell Douglas*]

prima facie case differ.  To make out a prima facie case in the retaliation context, the plaintiff must establish that (1) he engaged in protected activity, (2) he was subjected to adverse action by the employer, and (3) there existed a causal link between the adverse action and the protected activity.  *Id*. at 1231-32; *Smith v. Dist. of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005).

The initial burden of establishing a prima facie case of retaliation is "not great, as the plaintiff need only establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).  Making a charge of unlawful discrimination constitutes a protected activity.  *Broderick*, 437 F.3d at 1232.  To establish the adverse action prong, the plaintiff must show that a reasonable employee would have found the challenged action to be "materially adverse," meaning it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington Northern & Santa Fe Ry.*, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (citation omitted)).

One way a plaintiff can satisfy the causal connection requirement of a prima facie case of retaliation is by showing

---

formula, . . . and generally seems ready to accept the federal constructions of Title VII, given the substantial similarity between it and the D.C. Human Rights Act.").

that "'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'" *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 89 (D.C. Cir. 1985)).  However, temporal proximity is "not the only way to establish a causal connection." *Pegues v. Mineta*, Civ. Action No. 04-2165, 2006 U.S. Dist. LEXIS 59118, at *22 (D.D.C. Aug. 22, 2006); *see also Chungchi Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003) ("Temporal proximity is but one method of proving retaliation. . . . Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection.").  The Court "may also look to the evidence as a whole in the light most favorable to the plaintiff." *Pegues*, 2006 U.S. Dist. LEXIS 59118, at *22; *see also Buggs v. Powell*, 293 F. Supp. 2d 135, 149 (D.D.C. 2003) (finding that "proffered evidence as a whole, when viewed in the light most favorable to the plaintiff, create[d] an inference of retaliatory discrimination"); *Henderson v. Mineta*, Civ. Action No. 02-1498, 2005 U.S. Dist. LEXIS 16926, at *13-14 (July 14, 2005) (concluding that there was sufficient evidence from which a jury could reasonably infer a retaliatory motive despite arguments that the plaintiff's supervisor had no knowledge of plaintiff's protected activity

and that the alleged retaliatory actions occurred too "distant in time" from plaintiff's protected activity).

Defendant does not dispute that plaintiff engaged in various protected activities between 1995 and 1998 by filing grievances with the D.C. Department of Human Rights (now the D.C. Office of Human Rights) and by filing his complaint in this Court. Defendant argues, instead, that none of the alleged retaliatory acts in Counts V or VII of plaintiff's Second Amended Complaint constitute adverse action by the employer and/or plaintiff cannot show the requisite causal connection between the alleged retaliatory acts and his protected activity.[14]

### 1.    Count V: Denial of OIA Transfer

In Count V, plaintiff alleges that Chief Sonya Proctor and Inspector Kim Dine knew that plaintiff had filed discrimination charges against the MPD and a federal lawsuit and that they denied his application for a transfer back into OIA because of those protected activities. Just as the denial of this transfer was an adverse employment action for purposes of establishing a prima facie case of discrimination, the Court also finds that the denial was an adverse action for purposes of plaintiff's retaliation claim. Denying an employee a transfer back into a

---

[14] With respect to Count IX, defendant moves to dismiss based on plaintiff's failure to establish *Monell* liability. This claim is addressed separately, *infra*.

specialized division like OIA in which he has expertise might well dissuade a reasonable employee from making or supporting his charge of discrimination.

Plaintiff would have a difficult time establishing the causation prong of the prima facie test if he had relied on temporal proximity alone.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting prior cases finding that temporal proximity must be "very close").  The denial of the OIA transfer occurred about two years after plaintiff filed his DHR complaint alleging discrimination based on his transfer out of OIA and about eleven months after he filed his first complaint in this Court.  Looking at the evidence as a whole and taking into account the minimal burden plaintiff must overcome to establish a prima facie case of retaliation, however, the Court finds that plaintiff has met his burden as to Count V.

In April 1997, just one month after filing his first complaint in this Court, plaintiff met with Captain Patricia Alexander and then director of OIA, Inspector Lloyd Coward, to express his interest in returning to OIA.  Inspector Coward was encouraging during their conversation and told plaintiff he would have to check with the chief.  Captain Alexander requested a resume and plaintiff emailed one within a day or two of the meeting.  In December 1997, plaintiff ran into Captain Alexander in the elevator and reminded her that he was still interested in

38

the position in OIA.  In December 1997 or January 1998,
Inspector Coward was replaced by Inspector Dine as head of OIA.
In February 1998, a teletype was issued listing the individuals
transferred to OIA.  Plaintiff, however, was not selected for a
transfer.  When plaintiff inquired of Inspector Dine and Captain
Alexander why he was not transferred, Inspector Dine said he did
not know plaintiff was interested and Captain Alexander told
plaintiff that she forgot to pass on his resume to Inspector
Dine.  The evidence also suggests, however, that Captain
Alexander kept a file for each interested applicant and there is
no evidence to suggest that Captain Alexander forgot to inform
Inspector Dine about other interested applicants.  *See generally*
Alexander Dep.

     Plaintiff also points to some evidence in the record
indicating that the person who accepted his resume, Captain
Alexander, was told by Inspector Dine about the fact the
plaintiff had filed discrimination and/or retaliation complaints
in the past.  It is not clear from the evidence in the record
whether these conversations took place before or after a
decision not to offer plaintiff the vacant lieutenant position
in OIA.  At one point in her deposition, Captain Alexander
states that she learned about plaintiff's grievance against the
MPD from Inspector Dine within one week after her first meeting
with plaintiff.  *See* Alexander Dep. at 14-16.  Later in her

39

deposition, Captain Alexander says it was about a month or a month and a half after her meeting with plaintiff that she first learned about the grievance. *Id* at 26:12-20. Captain Alexander also states that she was informed about the prior complaint from Inspector Dine only after plaintiff filed a new complaint based on the denial of his transfer back into OIA. *Id* at 26-28.

The Court also views the evidence regarding the denial of plaintiff's transfer back into OIA against a backdrop of unrebutted record evidence that, prior to the denial of plaintiff's transfer, the police department retaliated against other officers who tried to expose the MPD's discriminatory treatment toward Hispanics by filing EEOC complaints and filing suits under the Whistle Blower's Statute. *See* Pl.'s Opp'n at 38-40. When all of the proffered evidence as a whole is viewed in the light most favorable to the plaintiff, the Court finds that plaintiff has raised at least an inference of retaliation sufficient to meet his minimal burden to establish a prima facie case with respect to Count V. Inspector Dine's knowledge of and conversations about plaintiff's prior discrimination complaints coupled with the failure to actually consider plaintiff for the OIA lieutenant position despite his previous experience in OIA, his submission of an application, the established procedure for filing applications, and his reminder to Captain Alexander of his interest in the position shortly before a decision,

especially when viewed in light of the history of discrimination against Hispanics in the police department, provide unrebutted evidence from which a reasonable juror could infer retaliation. Accordingly, the Court denies summary judgment to defendant as to Count V.

### 2.   Count VII: Denial of Other Transfers

In Count VII of his Second Amended Complaint, plaintiff points to a series transfers between 1996 and 2001, which he sought but was denied or which he was forced to undertake despite his lack of desire.  Plaintiff claims that the denial of his transfer requests "constitutes willful and intentional retaliation against him for being engaged in protected activity."  Second Am. Compl. ¶ 137.  Even if the Court were to find that the repeated denial of transfers or forced transfers to unwanted positions is the kind of adverse employer action that would deter a reasonable worker from making or supporting a claim of discrimination, the causation prong of the prima facie case is lacking.

Plaintiff offers no direct evidence that he was denied various transfers or transferred against his will in retaliation for any protected activity.[15]  Plaintiff must therefore point to

---

[15] Plaintiff points to deposition testimony of Cheryl Peacock to support his retaliation claim.  Peacock, who handled labor and EEOC matters for the MPD in 1994 and 1995, testified that she heard through the grapevine that plaintiff was not promoted because he was Hispanic.  Peacock Dep. at 26:4-27:21.

some circumstantial evidence that establishes a causal
connection between his various protected activities and the
alleged retaliation.  Plaintiff fails to do so.  Plaintiff
offers no record evidence in support of Count VII of his Second
Amended Complaint that even leads to an inference that any of
the decision makers who denied his transfer requests or made him
transfer knew of his protected activity.  *See* Def.'s Renewed
Mot. at 27 (citing excerpts from plaintiff's deposition in which
plaintiff states that plaintiff did not know if the people from
whom he sought transfers or who transferred him knew of any
protected activity in which he engaged).  Plaintiff's evidence
that OIA officials knew of his prior grievances does not
translate into knowledge of all other officials to whom he
applied for a transfer.

Unlike his argument with respect to Count V, plaintiff
rests his whole argument for causation with respect to Count VII
on the alleged temporal proximity between protected activities
and denial of transfers or forced reassignments.  To make out
the causation prong of a prima facie case based on temporal
proximity alone, however, the lapse in time between the two

---

Even if this evidence is taken as true, Peacock does not know who
she heard this information from (i.e., whether or not the person
was a supervisory official) and when she heard it.  Moreover,
while such evidence may support a claim for discrimination, it
does not show any direct evidence that plaintiff was retaliated
against for filing grievances or his lawsuit in this Court.

events must be very minimal.  *See Breeden*, 532 U.S. at 273
("Cases that accept mere temporal proximity between an
employer's knowledge of protected activity and an adverse
employment action as sufficient evidence of causality to
establish a prima facie case uniformly hold that the temporal
proximity must be 'very close'."); *Brodetski v. Duffey*, 141 F.
Supp. 2d 35, 43 (D.D.C. 2001) ("Although courts have not
established the maximum time lapse between protected Title VII
activity and alleged retaliatory actions for establishing a
causal connection, courts generally have accepted time periods
of a few days up to a few months and seldom have accepted time
lapses outside of a year in length.").  *See also, e.g.,
Willingham v. Gonzales*, 391 F. Supp. 2d 52, 61-62 (D.D.C. 2005)
(rejecting lapse of 6 months); *Hammond v. Chao*, 383 F. Supp. 2d
47 (D.D.C. 2005) (rejecting lapse of 18 months); *Gustave-Schmidt
v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004);  *Buggs v.
Powell*, 293 F. Supp. 2d 135, 148 (D.D.C. 2003) (holding that
time lapse "must be" less than 3 months).

The closest temporal relationship between one of
plaintiff's protected activities and an alleged retaliatory act
is at least eleven months.  In his opposition brief, Plaintiff
notes that he filed his second DHR complaint in February 1995
and then was ignored when he applied for a job at the Homicide
Division sometime in 1996.  Plaintiff also claims temporal

proximity based on Commander Scott's decision to remove plaintiff from the detective's office in October 1998. Plaintiff argues that this transfer happened "on the heel" of plaintiff's judicial complaint in March 1997 -- 19 months earlier.  Plaintiff's argument in support of his retaliation claim in Count VII rests on denied transfers or reassignments in 2000.  Plaintiff claims that these acts were in retaliation for the filing of his third DHR complaint in October 1998.

The temporal proximity with respect to the transfers and reassignments in Count VII is lacking.  Moreover, plaintiff points to no other evidence from which the Court can determine based on the record as a whole that plaintiff has established causation leading to an inference of retaliation.  Accordingly, the Court grants defendant's motion for summary judgment as to Count VII.

### 3. Count IX: Refusal to Return Plaintiff to Full Duty and Full Pay After Acquittal

In Count IX of his Second Amended Complaint, plaintiff alleges retaliation in violation of 42 U.S.C. § 1981 based on the MPD's refusal to return him to full pay and full duty status within 30 days of his acquittal on criminal charges. Defendant's only attempt to address this retaliation claim in its renewed motion to dismiss or, in the alternative, motion for summary judgment is in a footnote.  In footnote 8 of its motion, defendant states: "Count IX, though not a Due Process Claim, is

also brought under 42 U.S.C. § 1981 on grounds of retaliatory
discrimination.  Without addressing whether Plaintiff can
establish a *prima facie* case of discrimination based on this set
of circumstances, this claim should likewise be <u>dismissed</u> on
grounds that Plaintiff cannot make out his *Monell* claim."
Def.'s Renewed Mot. at 38 n.8 (emphasis added).[16]  Defendant
provides no argument in support of this statement nor does
defendant even address whether or not the facts underlying this
claim are disputed in its Statement of Material Facts as to
Which There is No Genuine Issue.  The Court therefore assumes
defendant is moving to dismiss Count IX for failure to state a
claim rather than moving for summary judgment as to Count IX.

     In *Monell v. New York City Dep't of Soc. Services*, 436 U.S.
658 (1978), the Supreme Court held that municipalities can be
sued as "persons" under 42 U.S.C. § 1983.[17]  However, the Supreme

---

[16] The Court also notes that defendant only raises
plaintiff's alleged failure to state a claim under *Monell* with
respect to plaintiff's due process claims and his claim in Count
IX.  Defendant does not raise any *Monell* issue with respect to
any of the other discrimination or retaliation claims brought
under 42 U.S.C. § 1981.  The Court therefore does not address
whether *Monell* is applicable to any of the other claims.

[17] Courts disagree about whether a plaintiff can bring a
damages claim against a state actor under 42 U.S.C. § 1981 or
whether such claims against state actors must be brought
exclusively under 42 U.S.C. § 1983.  *See Bolden v. City of
Topeka*, 441 F.3d 1129, 1136-37 (10th Cir. 2006) (outlining
disagreement).  In a recent unpublished opinion, the D.C. Circuit
held that a state actor enjoys Eleventh Amendment immunity from a
suit for damages under § 1981.  *See Quik Serve Food, Inc. v.
Wash. Metro. Area Transit Auth.*, No. 06-7092, 2006 U.S. App.

Court also held that municipalities are only liable for the official policies and customs of the municipality and cannot be liable based on a *respondeat superior* theory merely for employing a tortfeasor.  *Id*. at 691, 694.  "In order to state a claim against a municipality, the plaintiff therefore must allege not only a violation of his rights under the Constitution or federal law, but also that the municipality's custom or policy caused the violation."  *Warren v. Dist. of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004).

In this case, plaintiff has alleged a violation of his rights under federal law in that he claims retaliation in violation of 42 U.S.C. § 1981.  Defendant does not challenge the sufficiency of this allegation.  The Court therefore must only determine whether plaintiff has sufficiently alleged that a District policy or custom caused the violation of his rights.

---

LEXIS 28692, at *2-*3 (D.C. Cir. Nov. 17, 2006) (citing the Supreme Court's decision in *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 733-35 (1989), for the proposition that "the express cause of action created by § 1983 provides the exclusive federal damages remedy for violation of the rights guaranteed by § 1981 when the suit is against a state actor").  Even if plaintiff cannot bring his claim for damages directly under Section 1981, plaintiff indicates in his Second Amended Complaint that jurisdiction is conferred by 42 U.S.C. § 1983, among other statutes and provisions of the Constitution.  *See* Second Am. Compl. ¶ 1.  Construing the complaint liberally, as the Court must under Rule 8 of the Federal Rules of Civil Procedure, the Court reads Count IX to be alleging a Section 1983 claim based on a violation of Section 1981.

Causation can be shown in a number of ways.  First, plaintiff could demonstrate that "the municipality or one of its policymakers explicitly adopted the policy that was 'the moving force of the constitutional [or statutory] violation.'" *Id.* at 39 (quoting *Monell*, 436 U.S. at 694).  Second, plaintiff could show causation through adoption by demonstrating the policymaker's knowing failure to act in the face of unlawful actions by his subordinates that are so consistent that they form a "custom." *Baker v. Dist. of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  Finally, plaintiff could show that the municipality failed to respond "to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional [or statutory] violations." *Id.*

In his Second Amended Complaint, plaintiff alleges that "[a]gents and employees of the Metropolitan Police Department have long followed a custom and practice of retaliating against officers who file grievances." Second Am. Compl. ¶ 135.  He also alleges a number of retaliatory acts by officers in policy-making positions.  With respect to Count IX in particular, plaintiff alleges that the District, "through its agents and employees in policy-making positions," retaliated against him by failing to reinstate him to full duty and full pay within 30 days of his acquittal and by authorizing use of the Office of

47

Internal Affairs investigation process against him.  Plaintiff also alleges that the MPD Chief Ramsey was at least aware of these actions.

The Court finds that plaintiff has alleged enough to survive a motion to dismiss on Count IX.  Plaintiff alleges a violation of federal law.  Plaintiff also alleges a custom of retaliation in the police department.  Finally, although plaintiff does explicitly state his theory of causation, plaintiff allegations are sufficient to survive a motion to dismiss in that the facts suggest the possibility of proving causation by showing that a policymaker (Chief Ramsey) failed to act in the face of consistent acts of retaliation by his subordinates.  Accordingly, the Court denies defendant's motion to dismiss as to Count IX.

### D.   Count X: Other Discrimination and Retaliation Claims

In Count X of his Second Amended Complaint, plaintiff alleges discrimination and retaliation in violation of 42 U.S.C. § 1981 based on the MPD's refusal to allow him to participate in the MPD's Take Home Cruiser Program in 1995, 1999, and 2000. Plaintiff also alleges that the destruction and removal of a padlock from his office door in 1995 was discriminatory and retaliatory.  The headings in defendant's motion suggest that it is moving for summary judgment as to Count X because plaintiff cannot make out a prima facie case, yet defendant includes only

one sentence of argument with respect to Count X.  The treatment

of Count X is so limited that the Court can quote it is full:

"Further, Plaintiff has no personal knowledge as to whether

Commander Fitzgerald was aware of his complaints and/or

grievances when he ordered the lock to Plaintiff's shared office

removed."  *Id.*  This single sentence provides very little from

which the Court can understand the basis of defendant's motion.

The Court notes, however, that defendant bears the initial

burden of providing the Court with a basis for its motion.  See

*Celotex*, 477 U.S. at 323 ("[A] party seeking summary judgment

always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying

those portions of [the record], which it believes demonstrate

the absence of a genuine issue of material fact.")   The Court

will not read arguments into the motion that defendant has not

made itself.

Based on the single sentence actually addressing Count X in

defendant's motion, the Court interprets defendant to be moving

for summary judgment only as to the office break in and not as

to the denial of participation in the Take Home Cruiser Program.

Moreover, with respect to the office break in claim, the Court

interprets the motion to only challenge the causation element of

a prima facie case of retaliation and not to challenge any other

prong of a prima facie case of retaliation nor to challenge the prima facie case of discrimination.[18]

With respect to the office break in claim, defendant's sole argument in its motion for summary judgment is that plaintiff cannot establish a causal connection because plaintiff has no personal knowledge of whether his supervisor at the time knew about plaintiff's grievances when the supervisor ordered the lock to plaintiff's office to be removed.  In response, plaintiff does not refute that he has no personal knowledge about whether Commander Fitzgerald knew about his protected activity.  *See* Medina Dep. at 196:11-16 (admitting no personal knowledge).  Plaintiff also states in his deposition, however, that Commander Fitzgerald must have known because plaintiff had two DHR grievances pending at the time of the office break in and Commander Fitzgerald was a high-ranking official in the police department.  *Id*. at 196:20-197:8.  Plaintiff also argues that there is sufficient evidence of causation because the

---

[18] In its reply brief, defendant argues that plaintiff cannot show that the removal of a lock from his shared office or the failure to be given a take-home cruiser "clearly affects a requisite 'term, condition, or privilege of employment' as defined by and required by *Brown* [*v. Brody*]."  Def.'s Reply at 3. Since the defendant raised this argument for the first time in reply, the Court will not consider it.  *See McBride v. Merrell Dow & Pharmaceuticals*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to [Plaintiffs], but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered."  (citations omitted)).

office break in occurred just a few months after he filed his second DHR complaint.  Plaintiff does not dispute, however, that he filed his DHR complaint in February 1995 and Commander Fitzgerald ordered the padlock removed from his door in December 1995.  *See* Def.'s Statement of Material Facts ¶¶ 50, 54.

Even assuming the Court could find constructive knowledge on the part of Commander Fitzgerald as to Medina's DHR complaints, plaintiff cannot establish that there is a temporal proximity between his last protected activity and the break in to his office.  The removal of the padlock from plaintiff's office door did not occur for approximately ten months after he filed his second DHR complaint.  This lapse in time is too great to establish temporal proximity.  *See, e.g., Willingham*, 391 F. Supp. 2d at 61-62 (D.D.C. 2005) (rejecting lapse of 6 months). Because plaintiff is relying on mere temporal proximity alone and has not pointed the Court to any other record evidence suggesting causality or an inference of retaliation with respect to this claim, the Court finds that plaintiff has failed establish a prima facie case of retaliation with respect to the office break in.  Accordingly, the Court grants defendant's motion for summary judgment as to the portion of Count X alleging retaliation based on the office break in.

Defendant fails to even address the retaliation or discrimination allegations regarding the Take Home Cruiser

51

Program or the discrimination allegations regarding the office break in its motion.  The Court has been provided with no basis upon which to evaluate these claims.  Defendant has therefore failed to meet its burden of offering some basis upon which the Court should grant summary judgment with respect to these aspects of Count X.  Accordingly, the Court denies defendant's motion for summary judgment as to the discrimination claims in Count X and the portion of the retaliation claim related to the Take Home Cruiser Program.

## IV.   CONCLUSION

For the foregoing reasons, the Court **denies** plaintiff's motion for partial summary judgment and **grants in part and denies in part** defendant's motion to dismiss or, in the alternative, motion for summary judgment.  Specifically, the Court grants defendant's motion as to Counts I, II, VI, VII, VIII, and the portion of X alleging a retaliatory office break in.  The Court denies defendant's motion as to Counts III, IV, V, IX, the portion of X alleging discrimination and retaliation based on the denial of participation in the Take Home Cruiser Program, and the portion of X alleging discrimination based on the office break in.  An appropriate Order accompanies this Opinion.

**Signed:      Emmet G. Sullivan**
**             United States District Judge**
**             June 6, 2007**