# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANGEL MEDINA,

    Plaintiff,

    v.

DISTRICT OF COLUMBIA,

    Defendant.

Civil Action No. 97-594 (JMF)

## MEMORANDUM OPINION

This case is before me for all purposes including trial. Currently pending and ready for resolution is <u>Defendant's Notice of Refiling its Motion for Judgment as a Matter of Law or in the Alternative for New Trial, for Remittitur with References [sic] to the Trial Record</u> [#153]. For the reasons stated below, defendant's motion will be denied.

## BACKGROUND

In 1997, plaintiff, a Hispanic police officer with the Washington, D.C. Metropolitan Police Department ("MPD"), sued the District of Columbia for employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*,[1] and the D.C. Human Rights Act, D.C. Code § 2-1401.01, *et seq.* On July 29, 2008, following a jury trial, judgment was entered in favor of plaintiff and he was awarded $180,000.00. Specifically, the jury found that plaintiff was not discriminated against either in 1994 when he was transferred out of the Office of Internal Affairs ("OIG") upon his promotion from sergeant to lieutenant or in

---

[1] All references to the United States Code or the Code of Federal Regulations are to the electronic versions that appear in Westlaw or Lexis.

1998 when the MPD denied his application to return to the OIA. The jury did find, however, that plaintiff was retaliated against when the MPD failed to return him to full duty status following the dismissal of his criminal indictment and when he was not transferred to the OIA upon his request. The jury also concluded that the MPD's denial of his application to return to the OIA in 1998 constituted an adverse employment action.

## DISCUSSION

I.     Defendant's Motion for Judgement as a Matter of Law

   A.     Legal Standard

Defendant moves for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, which allows for a post-trial finding by the court that a reasonable jury did not have a legally sufficient evidentiary basis for its findings. See 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2521 (3d ed. 2009). "Judgement as a matter of law should only be granted 'if viewing the evidence in the light most favorable to the [non-moving party] and giving him the advantage of every fair and reasonable inference that the evidence may permit, there can be but one reasonable conclusion drawn.'" Fox v. District of Columbia, 990 F. Supp. 13, 19 (D.D.C. 1997) (quoting Richardson by Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 827 (D.C. Cir. 1988)). Finally, a Rule 50(b) motion is only permitted if the movant sought relief on the same grounds under Rule 50(a), before the case was sent to the jury. See id. at § 2537; Exxon Shipping Co. v. Baker, 128 S.Ct. 2605, 2617 n.5 (2008).

   B.     Plaintiff's Section 1983 Claim of Retaliation

      1.     The Parties' Positions

Defendant contends that the District is entitled to judgment as a matter of law as to plaintiff's Section 1983 claim because there was insufficient evidence of a custom and policy within the MPD of retaliating against individuals who complained of discrimination on the basis of their national origin. Defendant's Memorandum of Points and Authorities in Support of its Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial or Remittitur ("Defs. Mem.") at 8. First, defendant argues that plaintiff's own testimony was insufficient in that he failed to provide any examples of other Hispanic officers who complained of national origin discrimination and were subsequently retaliated against. Id. at 10. Second, defendant argues that the testimony of Officer Hiram Rosario also lacked specificity in that even though Officer Rosario testified that, as President of the Hispanic Police Association, he had occasion to meet with all of the MPD Chiefs of Police to discuss the concerns of the Hispanic officers, he, like plaintiff, failed to provide any concrete examples of complaints made by other Hispanic officers. Id. Third, defendant argues that Judge Hennessy's testimony was even more generalized than Officer Rosario's. Id. at 11. According to defendant, while Judge Hennessy testified that officers who complained were not viewed as team players and were given less favorable assignments, he made no mention of Hispanic officers in this context. Id. Finally, defendant argues that plaintiff's introduction into evidence of only three pages of a one hundred and three page document, the MPD Affirmative Action Plan, was misleading because the Plan was created five years prior to the alleged retaliatory behavior in this case and because, while the data table plaintiff introduced contains the transfer rates of Blacks, Whites, and Hispanics, it gives no explanation for why the various groups received transfers. Id. In other words, defendant argues that the table does not show that Hispanics were denied transfers in retaliation for complaining of

discrimination based on their national origin. Id.

Plaintiff offers two arguments in opposition. First, plaintiff notes that, although not common, "a municipality can be held liable under Section 1983 for a single bad act if the act was ordered or sanctioned by a municipal official with final policymaking authority." Memorandum in Opposition to Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial, or for Remittitur ("Plains. Opp.") at 5. Plaintiff then argues that the case at bar is just such a case because the individual directly responsible for the illegal discrimination was the Chief of Police, the official with final policymaking authority for the MPD and the official who denied plaintiff's request to transfer back to the OIA in 1998. Id.

Second, plaintiff argues that even if the Chief of Police was not the final policymaker, the evidence amply supported the jury's conclusion that there was a custom and practice of retaliation against Hispanic officers at the MPD who complained of discrimination. Plains. Opp. at 6-7. In support of his contention, plaintiff cites the following evidence: 1) Officer Rosario's testimony that he was demoted and subjected to adverse employment actions after he filed a claim of discrimination, 2) Judge Hennessy's testimony that Hispanic officers who challenged authority lost out on promotional opportunities, 3) Judge Hennessy's testimony that the MPD fostered a culture that negatively targeted those who were not team players, such as Hispanic officers who filed EEO claims, 4) Officer Cheryl Peacock's testimony that she was asked to apply for various positions and only spent seven days at the rank of Captain before she was promoted to Inspector, two ranks higher, and 5) the lack of evidence of any records describing the decision making or promotion process as further proof that the MPD discriminated and retaliated against Hispanic officers. Id. at 7-8.

2.    <u>Analysis</u>

Section 1983 of Title 42 of the United States Code states the following:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.

In the seminal case of <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978), the Supreme

Court held that in order for liability to attach to a municipality for civil rights violations under

section 1983, the municipality must have acted in accordance with a "government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy." <u>Id.</u> at 694.  The Court emphasized that the imposition of liability under

section 1983 was not based on a theory of *respondeat superior*, but rather was imposed only

where there was proof of a policy which itself violated the statute. <u>Id.</u> at 691.  <u>Accord</u> <u>Moonblatt</u>

<u>v. District of Columbia</u>, 572 F. Supp. 2d 15, 20 (D.D.C. 2008).  In other words, a plaintiff must

"show a course deliberately pursued by the city, 'as opposed to an action taken unilaterally by a

nonpolicymaking municipal employee.'" <u>Carter v. District of Columbia</u>, 795 F.2d 116, 123 (D.C.

Cir. 1986) (quoting <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 829 (1985)).

    a.    <u>Plaintiff Presented Sufficient Evidence that the Chief of Police, the
Final Policymaker with Regard to Transfers, Acted in a Retaliatory
Fashion When He Denied Plaintiff's Request to Transfer Back to
OIA in 1998</u>

In <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986), the Supreme Court held that a

single decision by a policymaker may be the basis for the imposition of section 1983 municipal liability. Id. at 480. The Court noted however that "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered" and that "[t]he fact that a particular official–even a policymaking official–has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Id. at 481-82. "With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Id. at 480. Accord Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989) ("Pembaur stands for the proposition that, under certain circumstances, municipal liability may be imposed for a single decision by a municipal policymaker.").

> i.  Plaintiff Presented Sufficient Evidence that the MPD Lacked Written Policies or Procedures Regarding Transfers and that the Chief of Police had Final Policymaking Authority with Respect to Transfers

The determination of whether an individual has final policymaking authority for purposes of imposing section 1983 municipal liability is determined by the court as a matter of state law. St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) ("Reviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law' . . . the trial judge must identify those officials . . . who speak with final policymaking authority for the local government [entity] concerning the action alleged to have caused the particular constitutional or statutory violation at issue.").

As the Supreme Court indicated, resort must be first be had to positive law but in this case it was not argued that there was a law or municipal regulation that granted the Chief of

Police the authority to make transfers. It follows then that it appropriate to look as the District's custom or usage. Indeed, the federal courts have specifically concluded that they may look to a municipality's custom or usage to determine whether a municipal official has final policymaking authority. Gros v. Grand Prairie, 181 F.3d 613, 616 (5th Cir. 1999); Feliciano v. Cleveland, 988 F.2d 649, 655 (6th Cir.), cert. denied, 510 U.S. 826 (1993); Mandel, 888 F.2d at 792-93.

In this case, plaintiff presented sufficient evidence at trial to permit me to conclude that the MPD lacked an official policy regarding the way in which transfers were to be carried out and that instead there was a distinct, well-established custom or practice that the Police Chief was the final policymaker with respect to these personnel actions.

First, the jury heard testimony about "general orders." The following excerpt is from plaintiff's testimony:

> Q   Yesterday we introduced the concept of general orders.
>     What are general orders?
> A   General orders are our policies for the police department.
>     They cover various topics from the structure of the police
>     department, organizational structure, to traffic enforcement,
>     to disciplinary actions.
> Q   Do the general orders contain policies of the Metro Police
>     Department?
> A   That's correct.

Tr. 7/22/08 at 33.

Judge William Lewis Hennessy, currently an Associate Judge with the District Court of Maryland and formerly a Captain with the MPD, also testified that "general orders dictate the policy of the agency." Tr. 7/22/08 at 133.

Next, the jury was informed that the MPD lacked any written policies or procedures governing transfers. The following excerpts are again from plaintiff's testimony:

| | |
|---|---|
| Q | Now, were you surprised when you were assigned to 3D? |
| A | No. |
| Q | Why is that? |
| A | Because again, it was common practice when you got promoted, you would be transferred. Although not written in any policy, it was common practice that they would do that. |

Tr. 7/21/08 at 110.

| | |
|---|---|
| Q | (BY MR. McKNIGHT) Are there any general orders that say a newly promoted officer must be transferred? |
| A | No. |
| Q | Are there any written procedures that describe how newly promoted officers are to be treated with respect to transfers? |
| A | No. |
| Q | Are there any guidelines on how newly promoted officers are supposed to be treated with respect to transfer[s]? |
| A | No. |
| Q | And so the only decider about how newly promoted officers are supposed to be is who, who decides? |
| A | The chief. |

Tr. 7/22/08 at 33-34.

The deposition testimony[2] of Glenn Hoppert, a former Commander at the MPD, echoed that of plaintiff:

| | |
|---|---|
| A | Well, when you get into a management position, they are not controlled under any type of labor agreement, such as the FOP, or the General Orders state - - there's a selection in there that anyone of a rank of sergeant and below, I believe, when a vacancy occurs - - excuse me, when a vacancy occurs in a special assignment position, and then you get into what a special assignment position is, there is a whole definition that goes along with that. |
| | You have what is a requirement that when a vacancy occurs at the sergeant or below, an announcement has to be |

---

[2] Hoppert's deposition testimony was read into the record at trial.

> published so many days and then people can apply. And
> there are requirements and there is a whole process that is
> laid out to fill the positions. That is not the case when it
> comes to management, lieutenants and above. There isn't
> really any documented, formalized process.

Tr. 7/22/08 at 172-73.

Finally, several witnesses testified at trial that the Police Chief was the sole individual

responsible for making transfer decisions. The following excerpt is from plaintiff's testimony:

> Q    (BY MR. McKNIGHT)  Based on the information you
>      received, who made the decision to transfer you out and to
>      keep Bailey in?  Who was the ultimate decision maker?
> A    Chief of Police Fred Thomas.

Tr. 7/21/08 at 137.

Patricia Alexander, an executive officer at the MPD's Regional Operational Command,

also addressed the role of the Police Chief with respect to transfers:[3]

> A    . . . I wouldn't have any control over promotions or
>      transfers.
> Q    Why is that?
> A    Because I didn't make the decision about who gets
>      promoted or who gets transferred from one unit to another.
> Q    How is that decision made?
> A    Its made in a number of ways.  Lieutenants and above the
>      chief makes the decision for transfers.  Promotions are
>      based on competitive exam.
> Q    But in terms of transfers, the chief makes the decision?
> A    The chief in conjunction with, at that time, it would have
>      been input - - if you're talking about Internal Affairs, with
>      input from the commander of Internal Affairs.

Tr. 7/22/08 at 163-64.

This was reiterated by Hoppert in his testimony, wherein he described the process he

_____

[3] Alexander's deposition testimony was also read into the record at trial.

9

went through when trying to fill a vacancy within his unit:

> What happens is when there is a vacancy, if I lost one of my lieutenants, I would get a list of every lieutenant in the police department and then look on a promotional roster, see if I knew they were going to promote. And I would go to my assistant chief and say, "I would like one of these five people, preferably in this order, if I can have them."

> And like I said, the assistant chief would - - and along with the chief of police, when it came to lieutenant and captain, those two would make the final decision, and maybe I would get who I asked for and oftentimes I got people that I didn't ask for, that they had decided this is who is going to be assigned to your unit.

> From my perspective, it was a point of making a recommendation of who I wanted and a final decision rested with the assistant chief and chief of police ultimately.

Tr. 7/22/08 at 173-74.

Through his own testimony as well as that of Judge Hennessy, Hoppert, and Alexander, plaintiff presented sufficient evidence that the MPD lacked any written policies or procedures regarding transfers and that the Police Chief had final policymaking authority in this area. Curiously, although plaintiff, in his opposition to defendant's post-trial motion, argues in that alternative that even if the Police Chief was not the final policymaker, liability still attaches, defendant did not attempt to refute plaintiff's evidence at trial that the Police Chief was the final policymaker. Therefore, based on the evidence presented, the Court concludes that plaintiff produced sufficient evidence that a well-established custom and usage made the Chief of Police the final decision maker of transfer decisions so that his decision may serve as the premise of municipal liability under § 1983.

ii.     Plaintiff Presented Sufficient Evidence that the Police Chief's Decision Was Motivated By Retaliatory Animus

Proof of causation may take several forms:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link . . . In the absence of that proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of fact should infer causation.

Lauren v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (internal citations omitted). Accord Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."). See also Barry v. U.S. Capitol Guide Bd., 636 F. Supp. 2d 95, 106-07 (D.D.C. 2009) and cases cited therein (a plaintiff must show both that the final policymaker was aware of plaintiff's protected activity and that the final policymaker's actions occurred because of plaintiff's protected activity).

Plaintiff presented uncontroverted evidence that the Police Chief was aware of the filing of his complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"). At trial, plaintiff's Exhibit 23 was admitted. That exhibit is a letter dated May 12, 1993, from the Government of the District of Columbia Department of Human Rights and Minority Business Development to Chief Fred Thomas, in which the Chief is notified that plaintiff has filed a complaint against him. See Defendant's Motion for Judgment as a Matter of Law or in the Alternative for New Trial, for Remittitur ("Defs. First Mot.") [#136] at Attachment 3; Tr. 7/21/08 at 122 ("THE COURT: . . . I'm going to admit this document only for the purpose of showing whether or not Mr. Thomas, as Chief of Police, learned of the compliant made by Mr.

Medina."). Also admitted at trial was plaintiff's Exhibit 21, plaintiff's Notice of Charge of Discrimination filed with the EEOC on May 4, 1993. According to the notice, Chief Thomas was sent a copy of the document. See Defs. First Mot. at Attachment 2; Tr. 7/21/08 at 123-24 (court admits plaintiff's Exhibit 21 without objection).

Both Judge Hennessy and Rosario provided explicit testimony regarding the pervasiveness of retaliatory behavior taken by the department against those officers who filed claims against it. Judge Hennessy testified as follows:

> Q     Judge, based on your experience and observation at the Metro Police Department, did you have occasion to observe in your own experience whether the Metro Police Department retaliated against officers who filed grievances against the Department?
>
> * * *
>
> A     My experience with the police department was that if they didn't view you as a team player, and obviously if you filed a grievance you were not viewed as a team player, that you were fair game. I mean, they would - - there was two sets of rules.
>
> One was for a team player and one was for the people who were not team players. If you were a team player, you know, poor judgment calls or even criminal activity would be overlooked, and if you were not a team player, it was obvious that they stretched the facts in some instances to bring you before disciplinary boards or to take other type of disciplinary action against you summarily.
>
> * * *
>
> Q     (BY MR. McKNIGHT) If you filed a discrimination complaint against the Metro Police Department, would you be considered to be a team player?
> A     Absolutely not.
> Q     And you observed this over your 25 years on the police department?

| A | Repeatedly. |
| Q | Did you observe this under the command of Chief Fred Thomas? |
| A | Probably less under him than any other time, but it had gotten to the point where it was cultural.  I mean, it had gone on for so long that people expected it, you know . . . |

Tr. 7/22/08 at 135-38.

Rosario provided similar testimony:

| Q | And based on your experience and observation, have you observed whether officers suffered, Hispanic officers suffered retaliation for filing grievances at the Metro Police Department? |
| A | We have numerous documented incidents. |

Tr. 7/22/08 at 99-100.

It was therefore not unreasonable for the jury, based on the record before it at trial, to infer that the Police Chief's decision to deny plaintiff request for a transfer to OIA in 1998 was motived by retaliatory animus

> b. <u>In the Alternative, Plaintiff Presented Sufficient Evidence that there was a Custom or Practice of Retaliation</u>

A "§ 1983 plaintiff . . . may be able to recover from a municipality without adducing evidence of an affirmative decision by policy makers if able to prove that the challenged action was pursuant to a state 'custom or usage'" <u>Pembaur v. Cincinnati</u>, 475 U.S. at 484 n.10.  In other words, "[s]ome actions are so 'permanent and well settled' that they may be considered governmental customs or practices even if they have not received formal approval through official state decision-making channels." <u>Moonblatt</u>, 572 F. Supp. 2d at 20 (quoting <u>Monell</u>, 436 U.S. at 691)).  Furthermore, there need not be multiple incidents to constitute a custom or practice:  "Egregious instances of misconduct, relatively few in number but following a common

design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question." Carter v. District of Columbia, 795 F.2d at 124. Finally, a plaintiff may establish a custom or policy by presenting evidence that the municipality is deliberately indifferent to the constitutional violations that are occurring. See City of Canton v. Harris, 489 U.S. 378, 388 (1989) ("Only where a municipality's failure to train its employees in a relevant evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."); Warren v. District of Columbia, 353 F.3d 36, 39 (D.C. Cir. 2004) ("[F]aced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction.").

Before reviewing the evidence pertaining to this issue, it is crucial to recall that plaintiff was not obliged to prove that the Chief of Police was the final decision making authority *and* that there was a custom or usage in the MPD of retaliating against police officers who complained of discrimination. Plaintiff could prevail by proving either. In Singletary v. District of Columbia, 685 F. Supp. 2d 81 (D.D.C. 2010), the District insisted that the plaintiff, a parolee, had to show that the decision to deny him parole was pursuant to a "policy, practice or custom of revoking parole 'based on unreliable multiple hearsay' and/or in violation of constitutional due process rights, or that such a policy was communicated to the Board." Id. at 90. Judge Kollar-Kotelly had to remind the District that since Singletary had contended and the District had conceded that the decision to revoke his parole "was made by the 'final municipal decision maker and [is] therefore properly attributable to the municipality.'" Id. (quoting Bd. of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 407 (1997)). Judge Kollar-Kotelly then stated:

14

"This is a distinct and independent means of proving municipal liability and does not require Singletary to allege the existence of an explicit policy or practice by the District." Id. The District's contention that Singletary had to prove an unconstitutional custom or practice *and* that the Parole Board was the final decision making authority "misse[d] the mark." Id. In the case before me, any contention by the District that plaintiff had an obligation to prove that the Chief of Police was the final decision making authority and that there was a custom or practice of retaliating against police officers who filed discrimination complaints misses the same mark.

I will nevertheless review the evidence presented to the jury tending to establish a custom or practice of retaliation because I believe that the plaintiff is entitled to the benefit of all the evidence he presented and to provide the court of appeals with the most complete record of my view of the evidence to obviate the need of a remand if it reverses my decision as to the sufficiency of the evidence that the Chief of Police was the final decision maker. In a case that has already gone on for too long, I owe the parties and the court of appeals at least that.

Although plaintiff failed to provide concrete examples of other Hispanic police officers who, after complaining of discrimination based on their Hispanic heritage, were retaliated against, he did present sufficient evidence from which a reasonable jury could conclude that the MPD was deliberately indifferent to the many complaints of discrimination and retaliation lodged by its officers. According to Rosario, when he met with the various Chiefs of the MPD over the years, in his capacity of President of the Hispanic Police Association, their response to him was inadequate:

> Q    In your role as president of the Hispanic Police Association, have you had an opportunity to meet with policymaking officials at the Metro Police Department?
> A    Yes, I have.

Q      And what sorts of issues have you brought to their attention?

A      Everything there  in promotion issues, upward mobility, transfers, promotions, discipline, retaliation.

Q      Now, can you give us a list of some of the officials with whom you have met over the years?

A      Chief Fred Thomas into Chief Sonya - - Interim Chief Sonya Proctor, Larry Soulsby, and Charles Ramsey.

Q      Have you discussed these issues with all these officials?

A      Yes, I have.

Q      And was this in a face-to-face meeting when you were there?

A      Yes.  On a regular basis.

Q      And how were you received?  What response did you receive?

A      The political response with quite a few, we're listening to your concerns; we're taking your concerns down; they're going to be addressed - - that kind [sic] thing.

Q      And did you find that in fact the officials were responding to the concerns and actively taking action in response to your concerns?

A      I would have to say "yes" and "no," because if that was the case, then my concerns via the members that I represent would have been heard by the top brass, then I would not have the need to take our complaints outside the District of Columbia government, when I have to wind up doing a compliant against our police department to the justice department.

* * *

Q      Did you discuss with the policymaking officials any concerns about Hispanic representation and specialized units over the years?

A      Yes, I did.

Q      And what concerns did you bring to their attention?

A      Our main concerns  was that no matter how qualified a Latino or Hispanic officer was, when it came time that they apply for positions, rarely were they selected.

Q      And how were you received and what was the response?

A      We're going to work with you; we're going to look into it; we're going to see.  We were even promised to set up study groups and do different things.

Q      From your observation, were the promises kept?

| | |
|---|---|
| A | I would have to say to some extent, very little it was. |
| Q | Over your 14 years, how many of these meetings have you had with the chief of police about these issues that you discussed? |
| A | Probably a couple dozen. |
| Q | Each time are you bringing the same issues to their attention again? |
| A | Yes, sir.  There was a time when I started the meetings with the command officials of a district or division.  If there were some concerns, I would try to meet with the commanding officer of communications.  If we saw that it was not moving quickly enough, then we went off to assistant chiefs all the way to the chief again. |
| Q | And the issues that you're talking about in terms of we've already discussed them, to some extent, you discussed with assistant chiefs and chiefs over the years since you've been present? |
| A | Yes. |

Tr. 7/22/08 at 93-95.

Rosario also testified about the MPD's failings with respect to the Hispanic Program

Coordinator's position, a position mandated by one of the MPD's General Orders:

| | |
|---|---|
| Q | What is the Hispanic Program Coordinator? |
| A | Its recognized, I believe, as in our general orders at one time, that individual will be kind of overseeing and looking into concerns of Hispanics within the Department. |

* * *

| | |
|---|---|
| Q | And can you identify this particular document? |
| A | Its Metro Police Department General Order 201.9, which is titled "Equal Employment Opportunity Program." |
| Q | Do you see this on the particular page where there's reference made to the Hispanic Program Coordinator? |
| A | Yes. |
| Q | Is this the general order that you were making reference to when you said it's in our general order to have a Hispanic Program Coordinator? |
| A | Yes. |

* * *

17

Q       Directing your attention to the early 1990's, you , of course, were the president at that time, correct?

A       That's correct.

Q       Was there a period of time when the Hispanic Program Coordinator position was unfilled?

A       Yes.  Sergeant Ross [ph.] was the person who occupied that position.  He went in the field and I made numerous attempts to get it filled, including that I even asked to be considered for that position.

Q       Who did you speak to?  You spoke to the chief of police about that?

A       Fred Thomas - - Chief Fred Thomas.

Q       And how were your efforts to get that position filled received by Chief Fred Thomas?

A       We're going to look into it; we're going to let you know.  I was given excuses from that the position was more geared towards an official.  Since I wasn't an official - - so when I was told that, then I put a list together of several officials that I approached and wanted the police department, the chief to consider them.  It still went unfilled.

Q       Now, earlier you mentioned that - - well, before I leave this document, I want to move to the next - - to subsection F at the bottom of the page there.  Do you see this subsection F here?

A       Yes.

Q       That there shall be an EEO committee appointed by the chief of police, and would you go to the next page, please, at the top, and do you see where the Hispanic Program Coordinator is supposed to be part of the EEO committee, correct?

A       Yes, sir.

Q       And during the period of time when there was no Hispanic Program Coordinator, there was no one from your community represented on the EEO committee?

A       That's correct.

Tr. 7/22/08 at 95-99.

C.     <u>Plaintiff Presented Sufficient Evidence that the MPD's Decision not to Transfer Plaintiff Back to OIA in 1998 was an Adverse Employment Action</u>

     1.     <u>The Parties' Positions</u>

Defendant also contends that the District is entitled to judgment as a matter of law as to

plaintiff's retaliation claims because the lateral transfers and non-transfers that plaintiff complains of do not rise to the level of adverse employment actions sufficient to establish a prima facie case of retaliation. Defs. Mem. at 12.  According to defendant, a prima facie case of retaliation requires the following: 1) a showing that plaintiff engaged in statutorily protected activity, 2) a showing that the MPD took an adverse personnel action, and 3) a showing of the causal connection between the two. Id. at 13.  Defendant argues that because the MPD's denial of plaintiff's application to transfer to OIA did not have any materially adverse consequences that affected the terms, conditions, or privileges of his employment or future employment opportunities and because there was no diminution in plaintiff's pay or benefits, he failed to make the requisite prima facie case. Id. at 17-18.

In response to this argument, plaintiff counters that the issue of whether or not a transfer is an adverse action is a question of fact for the jury and was properly resolved by the jury in this case. Plains. Opp. at 8-9.  In support of his argument, plaintiff points to his own testimony that had he stayed at OIA, he would have benefitted from specialized training and experience. Id. at 9. Plaintiff also cites to the testimony of Stanley Wiggenton, who retired as an Inspector with the MPD, and that of Sonya Proctor, who became acting Chief of Police in 1998, both of whom worked at OIA before they were promoted, as further proof of the career enhancing benefits of working at OIA. Id.

    2.   Analysis

In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," id. at 68, in that it would have "'dissuaded a reasonable

worker from making or supporting a charge of discrimination.'" <u>Rochon v. Gonzales</u>, 438 F. 3d 1211, 1219 (D.C. Cir. 2006) (quoting <u>Washington v. Ill. Dep't of Revenue</u>, 420 F. 3d 658, 662 (7th Cir. 2005)). While not stating so overtly, the Court also confirmed that the issue of whether or not an action was materially adverse was one for the jury: "Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." <u>Burlington N. & Santa Fe Railway Co.</u>, 548 U.S. at 71. <u>Accord Czekalski v. LaHood</u>, 589 F.3d 449, 454 (D.C. Cir. 2009) ("This circuit's standard for an adverse employment action is well-established: '[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable *trier of fact* could find objectively tangible harm.'") (quoting <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (emphasis added)); <u>Kelly v. Mills</u>, 677 F. Supp. 2d 206, 221 (D.D.C. 2010) ("[A]t trial *the factfinder* 'still first must determine whether plaintiff has suffered an adverse employment action.'") (quoting <u>Adesalu v. Copps</u>, 606 F. Supp. 2d 97, 103 (D.D.C. 2007) (emphasis added)).

In this case, the jury heard uncontroverted testimony regarding the importance of transfers generally to an officer's career. Rosario stated the following:

> Q    Why are transfers important to an officer at the police department?
>
> A    Most of us that are career officers and we have aspirations to move up within our departments, there are positions that are specialized divisions transfer-wise that will not - - you will not have to be promoted.
> For instance, if I wanted to go to special operations and maybe be assigned to the squad that moves the president around in the District, I don't have to be a sergeant to do that. It's a patrol officer. I can compete. I can apply for positions. We wasn't getting a fair shake with this. It didn't make a difference how qualified our members were.

> Many, many, many times over and over they were always
> surpassed . He was not chosen regardless of our skills and
> qualifications.

Tr. 7/22/08 at 100-01.

Hoppert also testified regarding the importance of transfers to an officer's career:

> Q     Now, does it help you move through the Department once
>       you become a lieutenant or above if you get certain
>       assignments as you move through?
>
>                              * * *
>
> A     Is it beneficial or are certain assignments beneficial to your
>       career?
> Q     Right.
> A     That depends on the individual, but there is a perception
>       that, yes, there were certain assignments that if you were
>       chosen to fill these assignments, that you were being
>       touched to go on to bigger and better things.

Tr. 7/22/08 at 176-77.

The jury's conclusion, based on the testimony of Rosario and Hopper regarding the

importance of transfers to an officer's career, that the MPD's decision to deny plaintiff's request

for a transfer back to the OIA was materially adverse to his career was reasonable. So too was

the jury's implicit conclusion that such an action would also have dissuaded other MPD officers

from filing their own claims of discrimination because they would fear that such an action might

jeopardize their careers within the department.

II.     Defendant's Motion for a New Trial

        A.      Legal Standard

In the alternative to judgment as a matter of law, defendant moves for a new trial pursuant

to Rule 59 of the Federal Rules of Civil Procedure, which allows for a new trial "after a jury trial,

for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). At the trial court's discretion,[4] a new trial should only be granted "where the court is convinced the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice." Martinez v. District of Columbia, 503 F. Supp. 2d 353, 355 (D.D.C. 2007) (internal quotations and quotation marks omitted). "Generally, a new trial may only be granted when a manifest error of law or fact is presented." In re Lorazepam & Clorazepate Antitrust Litig., 467 F. Supp. 2d 74, 87 (D.D.C. 2006). Finally, "[i]n deciding whether to grant a new trial, the court should be mindful of the jury's special function in our legal system and hesitate to disturb its finding." Lewis v. Elliot, 628 F. Supp. 512, 516 (D.D.C. 1986).

B.     The Parties' Positions

In support of its argument, defendant cites three reasons why a new trial is necessary to avoid "a clear miscarriage of justice." Defs. Mem. at 19. First, defendant argues that the court should not have admitted plaintiff's Exhibit 61, a Department of Human Rights and Local Business Development Letter of Determination, because its prejudicial value far outweighed its probative value. Id. at 19. In the document, the agency concluded that there was probable cause to believe that the MPD had violated the D.C. Human Rights Act with respect to its treatment of Hispanic officers. Id. at 20-21. Defendant argues that because the agency's determination was "not evidence, but rather an opinion as to the conclusions that should be drawn from that evidence," it should not have been admitted. Id. at 21.

Next, defendant argues that the court should not have admitted into evidence a Resolution

_____

[4] See Hutchinson v. Stuckey, 952 F.2d 1418, 1420 (D.C. Cir. 1992).

Agreement between the Department of Justice and the MPD because Judge Sullivan had previously excluded the agreement. Defs. Mem. at 22. Citing the law of the case doctrine, defendant argues that the court's admission of the agreement "amounts to a manifest error of law for which a new trial should be granted." Id.

Finally, defendant argues that it was clear error for the court to have admitted into evidence the testimony of Hiram Rosario, the testimony of Judge Lou Hennessy, and the MPD's Affirmative Action Plan. Id. at 22. With respect to Rosario and Hennessy, defendant claims that they both failed to provide any concrete examples of acts of retaliation by the MPD based on either national origin or pattern or practice of discrimination. Id. at 22-23. With respect to the MPD's Affirmative Action Plan, defendant argues that because it predates plaintiff's claims of discrimination and retaliation by five years, it is irrelevant and should not have been admitted into evidence. Id. at 23.

With respect to defendant's arguments regarding the court's admission of Exhibit 61, plaintiff first argues that the exhibit was properly admitted because defendant failed to object to the document when identified by the parties as Joint Exhibit No. 9 in their Joint Pretrial Statement and, although defendant did object to the same document when identified by plaintiff as Exhibit 64 in the Joint Pretrial Statement, defendant failed to include further argument regarding the exhibit in its Motion in Limine. Plains. Opp. at 10-11.

With respect to the Resolution Agreement, plaintiff argues that not only did defendant fail to object to this portion of the document at trial but because the document constitutes an admission against interest, it was properly admitted as probative and relevant. Id. at 12-13.

With respect to defendant's argument that the court improperly admitted the testimony of

Rosario and Hennessy, plaintiff argues that their testimony was appropriately admitted as lay witness testimony because it was based on their own personal observations regarding the customs and practices of the MPD vis a vis MPD Officers, including Hispanic Officers, who filed complaints against the Department. Id. at 13-14.

Finally, plaintiff argues that the court properly admitted the MPD's 1993 Affirmative Action Plan as proof that Chief Fred Thomas was aware of the contents of the document, namely that in that year, only Black and White Officers received transfers for the positions of Lieutenant and Captain. Id. at 15. According to plaintiff, the document is relevant to plaintiff's claim that he was discriminated and retaliated against in 1994 when his request to remain at OIA was denied even though the same request from Sergeant Bailey, a Black Officer promoted on the same day, was granted. Id. Plaintiff also argues that the document is relevant to his 1998 claim that he was discriminated and retaliated against when, according to plaintiff, his request to transfer back to OIA was denied. Id.

C.    Analysis

1.    The District Failed to Make at Trial the Objection It Claims It Made

The District's motion conveys the notion that plaintiff that plaintiff offered Exhibit 61 into evidence, the District objected, and the court overruled the objection and admitted the evidence. Defs. Mem. at 19-20. That is not at all what happened.

First, the exhibit identified at trial as Plaintiff's Exhibit 61 was listed as Joint Exhibit 9 in the pre-trial statement filed by the parties. Under the court's pre-trial order the parties were to list as joint exhibits "all the exhibits to which neither party has any objection." Pretrial Procedures Order [#108] (12/19/07) at 2. Since the District listed what became Plaintiff's

Exhibit 61 at trial as an exhibit to which it had no objection, it should be bound by that statement; it provided no reason at trial and provides none now as to why is should be relieved of its indication that it had no objection to the exhibit.

As the District concedes that it offered that document as a joint exhibit, it also noted, in the pretrial statement, its objection to the document on the grounds of relevance after plaintiff mistakenly listed it as a plaintiff's exhibit, even though it was already a joint exhibit. Plains. Opp. at 11.  Thus, the District offered as a joint exhibit the very exhibit it objected to on the grounds of relevance and it never withdrew from the position it took in an earlier part of the joint pretrial statement, that this exhibit should be a joint exhibit.

Second, when the exhibit was offered at trial, the District did not object to its admission. Tr. 7/21/08 at 163.  It must be recalled that at the trial the exhibits were projected onto a screen. When plaintiff's counsel caused Exhibit 61 to be projected onto the screen, the court specifically inquired of defendant's counsel whether he had any objection and he indicated that he did not. Id. When a juror indicated that he or she wanted to "go back", *i.e.*, go to a prior page, defendant's counsel then stated: "Your honor, I object to the legal analysis." Id.  When one looks at the document itself, it is clear that the objection was not to the document in its entirety but to the section of it captioned "Analysis," for the court immediately said: "All right.  I'll talk to the jury about it.  Ladies and gentlemen of the jury, that section on analysis–let's skip over that right now. That's a legal analysis.  We'll talk about the legal issues pertinent to this case later on.  Please go to page 5." Id.  In addition, when one again looks at Plaintiff's Exhibit 61, it is clear that the court's last direction to the person who was projecting the exhibit was to go to the next page, after the analysis section.  There was no further reference to this exhibit, for the next question to

plaintiff was: "Now, since this letter was issued, have you ever returned to the Office of Internal Affairs." <u>Id.</u> at 164.

Thus, the District first stipulated to the joint admission of a document while simultaneously objecting to it on the grounds of relevance, then indicated no objection to its admission when first offered, then changed its mind and objected only to a section of it, which was sustained in the sense that the court directed that the analysis section not be shown to the jury. Most significantly, the District never objected to paragraph six of Exhibit 61, which speaks to a resolution agreement between MPD and the Department of Justice; it objected only to the analysis section, which is on a different page. The District's argument–that the exhibit was admitted over its objection[5]–is completely incorrect. Surely, it cannot press as grounds for a new trial an objection that it never made at the trial, particularly when it permitted the jury, without objection, to see the paragraph to which it now objects.

2.    <u>Plaintiff's Exhibit 61 was Properly Admitted</u>

Even if the District had, in fact, objected to the admission of Plaintiff's Exhibit 61, the letter of determination, its admission over that objection would not have been in error. A report by another agency of the District of Columbia is an admission of a party opponent under Rule 801 of the Federal Rules of Evidence, that deems an admission of a party opponent to include "a statement by a person authorized by the party to make a statement concerning the subject." Fed. R. Evid. 801(d)(3)(c). The report surely appears to be a statement by "a person" authorized by the District of Columbia to make a statement concerning the subject matter of plaintiff's complaint. In <u>Wilburn v. Robinson</u>, 480 F.3d 1140 (D.C. Cir. 2007), the court held that, since

---

[5] Defs. Mem. at 20.

the District of Columbia was a party to the lawsuit, a statement by one of its employees was "admissible under Rule 801(d)(2)(D) as an admission of the District." Id. at 1148. If a statement by an employee is admissible under that theory, a finding by an agency of the District after an investigation is equally admissible. Skaw v. United States, 740 F.2d 932, 937 (Fed. Cir. 1984) (statements by Forest Service that lessee had made valid discovery of minerals on his claim admissible against United States as statement of party opponent); United States v. Amer. Tele. & Tele. Co., 498 F. Supp. 353, 356-58 (D.D.C. 1980) (statement of agents of the United States admissible against the United States). Hence, in Allen v. Chicago Transit Authority, 317 F.3d 696 (7th Cir. 2003), it was error for the trial judge to refuse to give any weight to the finding by the defendant's own investigator that the explanation given by the defendant's employee for promoting a white man over the African-American female plaintiffs was not credible. Id. at 700. "The finding was admissible as an admission made by an employee of a party opponent within the scope of his employment . . . and as an investigative report of a public agency." Id. (internal citations omitted).

Second, and independently, the federal courts have admitted findings of fact by the Equal Employment Opportunity Commission, relying on the exception to the hearsay rule for public reports and records. Fed. R. Evid. 801(8); Chandler v. Roudebush, 425 U.S. 840, 863 n.39 (1976) ( "Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo. See Fed. Rule Evid. 803(8)(c).").  While the Ninth and Fifth Circuits require their admission, see Bradshaw v. Zoological Soc., 569 F.2d 1066, 1069 (9th Cir. 1978); McClure v. Mexia Indep. Sch. Dist., 750 F.2d 396, 399-400 (5th Cir.1985), other Circuits indicate that the decision to admit them lies

within the discretion of the trial judge, who must weigh their probative value against the other considerations listed in Rule 404 of the Federal Rules of Evidence.  See, e.g., Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir.), cert. denied, 469 U.S. 1041 (1984); Walton v. Eaton Corp., 563 F.2d 66, 74-75 (3d Cir.1977); Cox v. Babcock & Wilcox Co., 471 F.2d 13, 15 (4th Cir. 1972).  The Eighth Circuit has indicated that such probable cause determinations are entitled to deference, Bell v. Bolger, 708 F.2d 1312, 1321 (8th Cir. 1983), while the Fifth Circuit has indicated that an EEOC investigator's finding that an unlawful discriminatory practice has occurred was highly probative of the ultimate issue involved in discrimination cases. Smith v. Universal Servs., 454 F.2d 154, 157 (5th Cir. 1972).  Surely, the District is not going to argue that the findings of its own agency are so unfair, biased, and inaccurate that they lack any probative value.

Finally, the District ignores the extraordinary care that was taken to make sure that the jury gave the most specific answers possible to questions that were designed to discriminate most carefully between the plaintiffs' claim of discrimination and his claim of retaliation.  Here is the verdict form and the jury's answers:

---

**VERDICT FORM**

1.      Did plaintiff establish by a preponderance of evidence that his being transferred out of the Office of Internal Affairs upon his promotion to Lieutenant denied him equal protection of the laws because it was based on his national origin?

        _____ Yes     (PROCEED TO QUESTION 2)

        _X_ No      (PROCEED TO QUESTION 4)

2.     Did plaintiff ALSO establish by a preponderance of evidence that his being transferred out of the Office of Internal Affairs upon his promotion to Lieutenant denied him equal protection of the laws because it was based on a custom or practice of discrimination against Hispanics of the District of Columbia?

_____ Yes     (PROCEED TO QUESTION 3)

_____ No      (PROCEED TO QUESTION 4)

3.     If the answers to questions 1 and 2 were "Yes" what damages do you award plaintiff?

$ _____ (PROCEED TO QUESTION 4)

_____

4.     Did plaintiff establish by a preponderance of evidence that his being transferred out of the Office of Internal Affairs upon his promotion to Lieutenant was an adverse employment action?

_____ Yes     (PROCEED TO QUESTION 5)

_X_ No        (PROCEED TO QUESTION 7)

5.     Did plaintiff ALSO establish by a preponderance of evidence that his being transferred out of the Office of Internal Affairs upon his promotion to Lieutenant was substantially motivated by his national origin?

_____ Yes     (PROCEED TO QUESTION 6)

_____ No      (PROCEED TO QUESTION 7)

6.     If the answers to questions 4 and 5 were "Yes" what damages do you award plaintiff?

$ _____ (PROCEED TO QUESTION 7)

_____

7. Did plaintiff establish by a preponderance of the evidence that the denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer for the position was based on his national origin?

_____ Yes    (PROCEED TO QUESTION 8)

__X__ No    (PROCEED TO QUESTION 10)

8. Did plaintiff ALSO establish by a preponderance of the evidence that the denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer for the position was based on a custom or practice of discrimination against Hispanics of the District of Columbia?

_____ Yes    (PROCEED TO QUESTION 9)

_____ No    (PROCEED TO QUESTION 10)

9. If the answers to questions 7 and 8 were "Yes" what damages do you award plaintiff?

$ _____ (PROCEED TO QUESTION 10)

_____

10. Did plaintiff establish by a preponderance of the evidence that the denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer for the position was an adverse employment action?

__X__ Yes    (PROCEED TO QUESTION 11)

_____ No    (PROCEED TO QUESTION 13)

11. Did plaintiff ALSO establish by a preponderance of evidence that the denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer for the position was substantially motivated by his national origin?

_____ Yes    (PROCEED TO QUESTION 12)

  X   No    (PROCEED TO QUESTION 13)

12.   If the answers to questions 10 and 11 were "Yes" what damages do you award plaintiff?

$ _____ (PROCEED TO QUESTION 13)

_____

13.   Did plaintiff establish by a preponderance of the evidence that the denial of his

application to return to the Office of Internal Affairs in 1998 and the selection of a white

officer denied him equal protection of the laws by retaliating against him for having filed

complaints complaining of discrimination on the basis of his national origin?

  X   Yes    (PROCEED TO QUESTION 14)

_____ No    (PROCEED TO QUESTION 16)

14.   Did plaintiff ALSO establish by a preponderance of evidence that the denial of his

application to return to the Office of Internal Affairs in 1998 and the selection of a white

officer was based on a custom or practice of retaliation against persons who complain of

discrimination on the basis of national origin?

  X   Yes    (PROCEED TO QUESTION 15)

_____ No    (PROCEED TO QUESTION 16)

15.   If the answers to questions 13 and 14 were "Yes" what damages do you award plaintiff?

 $90,000    (PROCEED TO QUESTION 16)

_____

16.   Did plaintiff establish by a preponderance of the evidence that a reasonable employee

would have found the MPD's denial of his application to return to the Office of Internal

Affairs in 1998 and the selection of a white officer a materially adverse action?

  X   Yes    (PROCEED TO QUESTION 17)

\_\_\_\_\_ No    (PROCEED TO QUESTION 19)

17. Did plaintiff ALSO establish by a preponderance of evidence that the MPD's denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer was done in retaliation for his making complaints of discrimination?

  X   Yes    (PROCEED TO QUESTION 18)

\_\_\_\_\_ No    (PROCEED TO QUESTION 19)

18. If the answer to question 16 was "Yes" what damages do you award plaintiff?

 $90,000    (PROCEED TO QUESTION 19)

_____

19. Did plaintiff establish by a preponderance of the evidence that the MPD's delay in restoring plaintiff to his police powers denied him equal protection of the laws because it was done in retaliation for his having filed complaints of discrimination?

\_\_\_\_\_ Yes    (PROCEED TO QUESTION 20)

  X   No    (YOU ARE DONE)

20. Did plaintiff ALSO establish by a preponderance of the evidence that the MPD's delay in restoring plaintiff to his police powers was based on a custom or practice of the District of Columbia?

\_\_\_\_\_ Yes    (PROCEED TO QUESTION 21)

\_\_\_\_\_ No    (YOU ARE DONE)

21. If the answer to questions 16 and 17 were "Yes" what damages do you award plaintiff?

$ _____ (YOU ARE DONE)

_____

It is impossible for the jury to have made it any clearer that it rejected all of plaintiff's claims of discrimination, meaning, of course, that while the District's Department of Human Rights concluded that the MPD discriminated against plaintiff when it denied his request to transfer back to OIA in 1998, the jury disagreed and answered "no" to question 7 on the verdict form. It is equally impossible, therefore, for the District of Columbia to establish that it was prejudiced in any way by the admission of the entire exhibit, let alone the only part to which it objected. Given that the entire report, including the only part to which the District objected, could have been properly admitted as the admission of a party opponent and as a report of a public agency, and that, in any event, the report could not possibly have affected the jury's verdict, its admission cannot be grounds for a new trial.

3.      The DOJ/MPD Resolution Agreement

On July 7, 2008, this Court granted in part and denied in part defendant's motion in limine with respect to the admission of the March 31, 1998 Resolution Agreement. See Memorandum Order [#118] (7/7/08). Specifically, the Court concluded that under Rule 407 of the Federal Rules of Evidence, it was proof of a subsequent remedial measure and therefore inadmissible. Id. at 10. Although defendant argues that the Court should not have admitted the Resolution Agreement into evidence, the Court never did. What was admitted was plaintiff's Exhibit 61, which, as just explained, contained a summary of the Resolution Agreement in the section captioned "Findings of Fact":

> On March 31, 1998, the Respondent signed a Resolution
> Agreement with the Office of Justice Programs (OJP), United

> States Department of Justice. This Agreement resolved complaint
> number 94-C-006 with the Hispanic Police Association in which
> the Respondent's employment practices violated Title VI of the
> Civil Rights Act of 1964, as amended and the Omnibus Crime
> Control and Safe Streets Act of 1968. This Resolution Agreement,
> in part, states that the Respondent will outline procedures for its
> promotion process, and testing procedures, to provide Hispanic
> employees with an equal opportunity for promotion. Respondent
> also agreed to assess job assignments and training opportunities
> and to develop objective standards, as necessary for making
> assignments and providing training that is not based solely upon
> language skills or national origin.

Defs. First Mot., Attachment 11 at 4.

Thus, the Resolution Agreement itself was not admitted at trial; only the section of the

letter of determination, exhibit 61, that referred to it was admitted and, in any event, the section

that was admitted speaks to plaintiff's claim of *discrimination*. Since the jury did not conclude

that plaintiff had been discriminated against, the admission of this summary did not prejudice

plaintiff in any way.

###     4.     Plaintiff's Exhibit 28 Was Properly Admitted

Plaintiff offered into evidence a page of the District of Columbia Metropolitan Police

Department Affirmative Action Program as Exhibit 28. Tr. 7/22/08 at 67. The defendant made

the following objection:

> First of all, dealing with the Plaintiff's Exhibit 28. The District
> objects to this document coming into evidence. The last page sets
> forth a table of statistics, and I think this leads clearly to
> speculation from the jury as to what these numbers mean, and
> on that basis it should not come into evidence because I think
> that you would have -- they would have to have a statistician
> explain what is the adverse impact ratio column, what does
> that mean where it has 1.0 -- 1.0.47.77. That kind of
> statistical evidence, I don't think is within the ken of the
> average layperson that they can make out or understand the
> statistics. So, on that basis, I would certainly object to

Exhibit No. 28 coming into evidence.

Tr. 7/23/08 at 7.

Shortly thereafter, the court sustained the only objection made:

> I'm going to admit Plaintiff's 28.  I am going to tell the jury to
> disregard the reverse impact ratio because it's unexplained
> and inexplicable on this record.  It otherwise constitutes an
> admission of a party opponent and bears on the issue of
> whether there is a custom and practice of discrimination
> against Hispanic people, which is of course the gravamen of
> the claim.

Id. at 11.

The court then caused the exhibit to be projected on the screen and stated to the jurors:

> Ladies and gentlemen, if you look at this document, this last page,
> the Table 14.2 shows some percentages and percentages of
> transfers and shows a difference.  The first three columns, seem to
> me, to be simply mathematics.  The last column says "Adverse
> Impact Ratio."  That is a term of statistics, and frankly, I don't
> know what it means.  Usually in college when they said this is the
> statistics class, I said, "I'm awfully sorry I'm in the wrong
> class.  I was looking [for] the legal history [class]."  So, let's look at
> -- the first three, it seems to be, are well within your experience
> since you can add and subtract.  The last one, we
> don't know what it means.  Disregard it completely.  It's
> meaningless to us.  It's as if it were written in a different
> language.

Id. at 17.

Thus, the District's assertion that Exhibit 28 was admitted over its objection is also

incorrect.  The court sustained the only objection the District made by instructing the jury to

disregard the only section of the document to which the District objected.  Its doing so cannot

possibly be the basis for a new trial.

Furthermore, like Exhibit 61, exhibit was properly admitted as an admissions by a party

opponent and, again like Exhibit 61, it dealt with discrimination and not retaliation. Since the jury exonerated the District of all claims of discrimination, its admission could not have possibly have prejudiced the District.

> 5. The Testimony of Rosario and the Testimony of Judge Hennessy Were Properly Admitted

First, although neither Judge Hennessy or Rosario provided concrete examples of retaliation by the MPD, they did both provide testimony that supports the jury's finding that the MPD had a custom or policy of retaliation. Upon that theory, their testimony was properly admitted. They recounted their observations of the practices and customs of the MPD based on their observations. Their opinions as to those practices and customs, based on those observations, were certainly admissible under Rule 701 of the Federal Rules of Evidence.

III. Defendant's Motion for Remittitur

Finally, defendant moves the court to either order a new trial limited to the issue of damages or grant the motion for a remittitur conditioned on plaintiff's acceptance of a reduced damage award. Defs. Mem. at 24.

A. Legal Standard

"A jury award must stand unless it is 'beyond all reason' or 'so great as to shock the conscience.' Daskalea v. District of Columbia, 227 F.3d 433, 443 (D.C. Cir. 2000) (quoting Williams v. Steuart Motor Co., 494 F.2d 1074, 1085 (D.C. Cir. 1974)). Furthermore, "'[c]ourts may not set aside a jury verdict merely deemed generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice.'" Id. (quoting Langevine v. District of Columbia, 106 F.3d 1018, 1024 (D.C. Cir. 1997)) (internal quotations omitted). Finally, remittitur "is appropriate only if the verdict 'is so inordinately large as obviously to exceed the

maximum limit of a reasonable range within which the jury may properly operate.'" <u>Id.</u>

B.     The Parties' Positions

Defendant argues that the jury award of $180,000.00 was excessive in light of the evidence presented at trial in that 1) plaintiff failed to put forth any evidence of actual damage to him, and 2) the jury awarded plaintiff double recovery for his retaliation claim by awarding him $90,000.00 for having proven an element of retaliation and then $90,000.00 for having proven retaliation. Defs. Mem. at 26-27.

Plaintiff counters that his recovery was for one count of discrimination and one count of retaliation and that a claimant is permitted to "recover under more than one theory arising out of the same circumstances." Plains. Opp. at 16-17.  Plaintiff also notes the presumption against disturbing jury awards unless "so unreasonably high as to result in a miscarriage of justice." <u>Id.</u> at 18 (quoting <u>Langevine</u>, 106 F.3d at 1024.).

C.     Analysis

1.     Plaintiff Put Forth Sufficient Evidence of Actual Damages

Although defendant contends that plaintiff failed to put forth any evidence of actual damages, the record proves otherwise:

> Q     (BY MR. McKnight) Captain Medina, has this affected you emotionally or your relationship with your family at all?
> A     Absolutely.  Mentally, anguish, anxiety, the lack of concentration at work, having to go there and deal with the situation.  You know, I know at times, you know, I probably would snap at home.
> Q     Do you think this has affected your reputation in the Department?
> A     Yes, I think it has, because as a captain now pretty much I believe I've reached the end of the road as far as promotions.  I've gone through the civil service process.  And I've got this far, but you know, again, I feel that I have

> the skills and qualifications to go beyond, but again, now it's out of my control. Now, it's bypassed me and only the chief makes that call.
>
> Q     How does an officer's reputation affect his ability to move through the police department once you get above sergeant?
>
>                 * * *
>
> A     The most difficult part was when I returned back to duty from the absence. People look at you. I would never imagine myself being in that situation. But, you know, people look at you and you never know what they're thinking. My credibility was shot. My reputation was shot, you know, but up to that point, I think, you know, people knew what they were getting with Angel Medina. My supervisors knew what they were getting with Angel Medina. It hurt. It's now a rebuilding process for me to try to get established that you know who I really am.
>
> Q     Did you ever seek any treatment or talk to a psychiatrist about any of this?
>
> A     I've currently been for the last year going to therapy with our EAP, Employee Assistance Program, and prior to that, I did have a couple of sessions with our then pastor in the church.

Tr. 7/21/08 at 180-83.

       2.      <u>Plaintiff Was Not Awarded Double Recovery</u>

The jury awarded plaintiff a total of $180,000 in damages. First, the jury awarded plaintiff $90,000 upon their conclusion that plaintiff had proven that defendant had violated Title VII of the Civil Rights Act. As indicated in the verdict form reproduced above, the jury concluded that: 1) plaintiff had established "by a preponderance of the evidence that the denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer denied him equal protection of the law by retaliating against him for having filed complaints complaining of discrimination on the basis of his national origin," and that 2) plaintiff had established "by a preponderance of evidence that the denial of his application to return to the

Office of Internal Affairs in 1998 and the selection of a white officer was based on a custom or practice of retaliation against persons who complain of discrimination on the basis of national origin." See Verdict Form, Question # 13. This question was based on plaintiff's claim under the federal statute, 42 U.S.C. § 1983.

Second, the jury concluded that: 1) plaintiff had established "by a preponderance of the evidence that a reasonable employee would have found the MPD's denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer a materially adverse action," and that 2) plaintiff had established "by a preponderance of evidence that the MPD's denial of his application to return to the Office of Internal Affairs in 1998 and the selection of a white officer was done in retaliation for his making complaints of discrimination." Verdict Form, Questions 16-18. These questions were based on the D.C. Human Rights Act and spoke not to plaintiff's right under the United States Constitution to equal protection under the law, as did Question 13, but to his rights under District of Columbia Human Rights Act not be subjected to retaliation for making complaints of discrimination. Thus, contrary to defendant's claim that plaintiff recovered twice upon the same theory of retaliation, plaintiff actually recovered once under a federal statute and once under a District of Columbia statute. The District must recall that Congress has specifically indicated that nothing in federal civil rights statutes "shall be deemed to exempt or relieve any person from any liability, duty, penalty or punishment provided by any present or future law or any State or political subdivision of a State." 42 U.S.C. § 2000e-7.

## CONCLUSION

Defendant has failed to prove that it is entitled to judgment as a matter of law, or in the

alternative, to a new trial or to remittitur.  Defendant's motion will therefore be denied.  An

Order accompanies this Memorandum Opinion.


_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE